Stephen J. Joncus
Oregon Bar No. 013072
JONCUS LAW P.C.
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
Telephone: (971) 236-1200
Facsimile: (971) 244-7997
steve@joncus.net

David J. Schexnaydre, T.A., *Pro Hac Vice Pending*
Louisiana Bar Roll #: 21073
Mississippi Bar Roll #: 102557
Texas Bar Roll #24076142
2895 Highway 190 • Suite 212
Mandeville, Louisiana 70471
Telephone: (985) 292-2020
Facsimile: (985) 235-1089
david@schexnaydre.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| JESSE ABRIGO, *et al,* | Case No.: 6:23-cv-1804 |
| *Plaintiffs*, | |
| v. | **COMPLAINT** |
| KAISER FOUNDATION HOSPITALS, GREG ADAMS, AND ANDREW BINDMAN, MD | Demand for Jury Trial |
| Defendants. | |

COMPLAINT                    1

NOW INTO COURT, through undersigned counsel, come Plaintiffs, Jesse Abrigo, *et al*, (hereinafter "Plaintiffs"), who respectfully file this Complaint against Defendants, Kaiser Foundation Hospitals, Inc.; its policymakers, the CEO Greg Adams, and Chief Medical Officer (CMO) Andrew Bindman, MD, in their individual and representative capacities, (hereinafter "Defendants"), presenting allegations and causes of action as follows:

**TABLE OF CONTENTS**

Description of Cause of Action                                          6

I.       Introduction                                                   7

II.      Jurisdiction and Venue                                         9

III.     Plaintiffs                                                    10

IV.      Defendants                                                    12

V.       History and Facts                                            12

         A. The Belmont Report                                        14
         B. 45 CFR Part 46                                            16
         C. Legally Effective Informed Consent                        20
         D. ICCPR Treaty                                              22
         E. HHS EUA Precedent                                         25
         F. Judicial EUA Precedent                                    26
         G. Federal Wide Assurance (FWA)                              27
         H. CDC Covid-19 Vaccination Program Provider Agreement       30
         I. COVID-19 Research Activities                              35

VI.      Factual Allegations                                          43

         A.  Kaiser Hospitals for Children                            43
         B.  Emergency Use Authorization (EUA)                        48
         C.  Emergency Use Instructions (EUI)                         58
         D.  PREP Act                                                 59
         E.  Federal Wide Assurance Agreement                         63
         F.  State Action                                             64
         G.  State Action Tests                                       69
         H.  Fourteenth Amendment Equal Protection of Laws            75
         I.  Fourteenth Amendment Due Process                         77
         J.  Willful and Wanton Disregard for Rights                  79

VII.     Legal Claims                                                 84

Count One: 42 U.S.C. § 1983 – Subjected to Investigational Drug Use   84

Count Two: 42 U.S.C. § 1983 – Deprivation of Equal Protection Rights  87

Count Three: 42 U.S.C. § 1983 – Deprivation of Due Process Rights     88

Count Four: 42 U.S.C. §1983-Deprivation of Substantive Due Process Rights   89

Count Five: 42 U.S.C. §1983-Deprivation of Rights Under Spending Clause        91

Count Six: 42 U.S.C. §1983-Excessive Fine Clause        95

Count Seven: 42 U.S.C. §1983-Unconstitutional Conditions Doctrine        98

Count Eight: 42 U.S.C. §1983-PREP Act        99

Count Nine: Breach of Contract, Third Party Beneficiary        102

Count Ten: Wrongful Termination        103

Count Eleven: Intentional Infliction of Emotional Damage        104

Count Twelve: Implied Private Right of Action 21 U.S.C. §360bbb-3        106

VIII.    Damages Recoverable and Demanded        107

IX.    Jury Trial Demand        108

## **TABLE OF CONTENTS OF EXHIBITS**

| Exhibit Name | Exhibit No. |
| --- | --- |
| CDC Provider Agreement | A |
| 8/23/2021 FDA EUA Letter to Pfizer | B |
| Kaiser's COVID-19 Policy | C |

## DESCRIPTION OF CAUSE OF ACTION

**This is a §1983 case seeking redress from Defendants for the deprivation of Plaintiffs' Constitutional and federally secured right to refuse an EUA investigational drug without incurring a penalty or loss of benefits to which Plaintiffs were otherwise entitled.**

This lawsuit is being brought under 42 U.S.C. §1983 seeking redress for deprivation of rights granted to Plaintiffs by the United States Constitution, 21 U.S.C. §360bbb-3 *et seq* (the EUA statute), 42 USC §247d-6d *et seq* (the PREP Act), 45 CFR Part 46, 18 U.S.C. §242, ICCPR Treaty, and the common laws of the State of Oregon to hold accountable Kaiser Foundation Hospitals, Inc., State Actor at all times pertinent herein, and its PolicyMakers, the Chief Executive Officer (CEO) Greg Adams, and Chief Medical Officer (CMO) Andrew Bindman, MD, (Kaiser and its named executives will be collectively referred to as "Kaiser PolicyMakers") for damages arising out of their unconstitutional, unlawful, malicious, unequal and contractually violative COVID-19 EUA/PREP Act drug mandate. Special laws apply to Kaiser's mandate because the FDA defines the drugs at issue as "investigational with no license for any indication." And even though Defendant's mandate was instituted during and in response to a pandemic emergency, as the U.S. Supreme Court noted since the beginning of the pandemic: "**even in a pandemic, the Constitution cannot be put away and forgotten**." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 208 L.Ed.2d 206 (2020).

COMPLAINT                                      5

# I.    <u>INTRODUCTION</u>

1.    In early 2020, the nation and the world faced a novel, highly contagious coronavirus called SARS-CoV-2, which caused the disease COVID-19.

2.    On January 31, 2020, the Secretary of Health and Human Services (HHS) declared a public health emergency and, in conjunction with the U.S. Food and Drug (FDA) Commissioner, issued several Emergency Use Authorizations (EUAs) for COVID-19 investigational new drugs.

3.    EUAs are issued pursuant to 21 U.S.C. 360bbb-3, *et seq*, commonly referred to as the EUA statute.

4.    Additionally, the HHS Secretary placed those EUA products under PREP Act authority and listed them as covered countermeasures for purposes of providing liability immunities for their manufacturers and the persons administering them.

5.    PREP Act authority is issued pursuant to 42 U.S.C. 247e-6d, *et seq*.

6.    The Department of Defense (DoD) contracted with Pfizer to manufacture and distribute in excess of 100 million doses of its Pfizer-BioNTech COVID-19 Vaccine,[1] triggering voluminous laws associated with federal funding of unlicensed medical products.

7.    To comply with those laws, the Executive Branch created the federally funded CDC COVID-19 Vaccination Program for the purpose of distributing the federal COVID-19 property to states and private parties authorized to participate in the program.

---

[1] The FDA improperly allowed Pfizer to add the word "Vaccine" to its EUA product's investigational name.  The court should not confuse this name to mean the drug's legal indication as a vaccine. As set forth in more detail below, the FDA advised Pfizer that its Pfizer-BioNTech COVID-19 Vaccine "is an investigational vaccine having no indication to treat any condition."

8.      Governor Kate Brown volunteered the State of Oregon (hereinafter "State") to participate in distributing the federal property, binding herself to the same duties as owed by President Biden and other persons within the executive branch of the federal government.

9.      Moreover, Governor Brown was bound to apply the laws associated with the COVID-19 federal property in accordance with the Fourteenth Amendment's due process and equal protection of laws doctrines.

10.     The State required participating providers (e.g., state-licensed medical facilities and healthcare workers, pharmacies, etc.) to sign the CDC COVID-19 Vaccination Program Provider Agreement to ensure duties owed by the federal and state governments were complied with.

11.     Congress only authorized the HHS Secretary to grant expanded access protocols for the unlicensed use of drugs, biologics, and devices during a declared emergency.

12.     However, Congress expressly restricted the HHS Secretary from requiring any person to participate in any activity (e.g., manufacturing, distribution, administration, or use of a product) that becomes lawful pursuant to 21 U.S.C. §360bbb-3 (the EUA statute). [2]

13.     Moreover, Congress expressly prohibited the federal executive branch and the States from establishing, enforcing, or continuing in effect with any law interfering with the requirement of the EUA statute and the PREP Act that persons considering an activity or countermeasure are informed of their "option to accept or refuse."[3]

14.     In August 2021, Kaiser PolicyMakers, acting under color of law, but in violation of federal law and outside the scope of their discretionary authority, announced to their employees

---

[2] 21 U.S.C. §360bbb-3(l)
[3] 42 U.S.C. §§ 247d-6d, 6e

that a new condition of employment required employees to inject the federal COVID-19 property into their bodies as a condition to start or continue employment.

15. Kaiser PolicyMakers usurped the authority of Congress and the HHS Secretary by amending the Scope of Authorization for each EUA drug and the requirements of the CDC Vaccination Program by requiring that which Congress prohibits, leading to Plaintiffs' financial, emotional, and legal damages.

16. Defendants had no authority to require Plaintiffs to inject an unlicensed EUA drug into their bodies as a condition of anything because Congress specifically conferred authority onto individuals to either accept or refuse the EUA and PREP Act products without interference.

17. When Plaintiffs exercised their federally secured right to refuse, Defendants initiated a scorched earth policy and applied maximum emotional pressure on Plaintiffs in hopes of compelling them to surrender their federal statutory and Constitutional rights.

18. Plaintiffs remained steadfast in their right to refuse, so Defendants segregated, penalized, humiliated, terminated, and denied unemployment benefits to Plaintiffs, among other things, despite Defendants assuring the federal government and the State they would comply fully with all applicable laws and requirements associated with the federal COVID-19 property.

19. Defendants' conduct shocks the conscience; it is outrageous and conducted with willful and wanton disregard for the rights, safety, and health of Plaintiffs.

## II.    JURISDICTION AND VENUE

20. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

21. The civil rights portions of this action raise federal questions under the Spending Clause and the Fourteenth Amendment to the U.S. Constitution.

22. This Court has original jurisdiction under 42 U.S.C. §§ 1983 and 1988.

COMPLAINT                                      8

23.     This Court has the authority to award costs and reasonable attorney's fees under 42 U.S.C. § 1988.

24.      This court has supplemental jurisdiction over Plaintiffs' state law claims.

25.     This Court has personal jurisdiction over Defendants as they are domiciled within this Court's jurisdictional boundaries.

26.     This Court has subject matter jurisdiction over the parties because all acts complained of herein were committed by Defendants in the State of Oregon and caused damage and/or deprivation to the Plaintiffs listed herein.

27.     Venue is proper in this court because all events underlying the claims in this Complaint occurred in the State of Oregon, which is situated within this Court's jurisdiction, and all Defendants reside in the State of Oregon.

### III.     PLAINTIFFS

28.     The following individuals are plaintiffs herein:

28.1.    Plaintiff Jesse Abrigo is an adult individual who, at all times pertinent, resided in the State of Oregon and was previously an employee of Kaiser in Oregon.

28.2.    Plaintiff Charlotte Bailey is an adult individual who, at all times pertinent, resided in the State of Oregon and was previously an employee of Kaiser in Oregon.

28.3.    Plaintiff Sarah Lynn Becker is an adult individual who, at all times pertinent, resided in the State of Oregon and was previously an employee of Kaiser in Oregon.

28.4.    Plaintiff Brian Cady is an adult individual who, at all times pertinent, resided in the State of Oregon and was previously an employee of Kaiser in Oregon.

28.5.    Plaintiff Jeff Coffey is an adult individual who, at all times pertinent, resided in the State of Oregon and was previously an employee of Kaiser in Oregon.

28.6.    Plaintiff Rogina Cooper is an adult individual who, at all times pertinent, resided in the State of Oregon and was previously an employee of Kaiser in Oregon.

28.7.    Plaintiff Angela Debozy is an adult individual who, at all times pertinent, resided in the State of Oregon and was previously an employee of Kaiser in Oregon.

28.8.    Plaintiff Seth Goddard is an adult individual who, at all times pertinent, resided in the State of Oregon and was previously an employee of Kaiser in Oregon.

28.9.    Plaintiff Paula Hennessey is an adult individual who, at all times pertinent, resided in the State of Oregon and was previously an employee of Kaiser in Oregon.

28.10.   Plaintiff Marilee Joy is an adult individual who, at all times pertinent, resided in the State of Oregon and was previously an employee of Kaiser in Oregon.

28.11.   Plaintiff Elizabeth Kline is an adult individual who, at all times pertinent, resided in the State of Oregon and was previously an employee of Kaiser in Oregon.

28.12.   Plaintiff Brandi Nelson is an adult individual who, at all times pertinent, resided in the State of Oregon and was previously an employee of Kaiser in Oregon.

28.13.   Plaintiff Janet Roberts is an adult individual who, at all times pertinent, resided in the State of Oregon and was previously an employee of Kaiser in Oregon.

28.14.   Plaintiff Linda Robinson is an adult individual who, at all times pertinent, resided in the State of Oregon and was previously an employee of Kaiser in Oregon.

28.15.   Plaintiff Trista Slowik is an adult individual who, at all times pertinent, resided in the State of Oregon and was previously an employee of Kaiser in Oregon.

28.16.   Plaintiff Jessica VanOrtwick is an adult individual who, at all times pertinent, resided in the State of Oregon and was previously an employee of Kaiser in Oregon.

28.17.   Plaintiff Jessica West-Betz is an adult individual who, at all times pertinent,

resided in the State of Oregon and was previously an employee of Kaiser in Oregon.

## IV.    DEFENDANTS

29.    The following are named as defendants herein:

29.1.    Defendant, Kaiser Foundation Hospitals, is a non-profit, public-benefit corporation formed according to the laws of the State of California and headquartered in Oakland, California, with its agent for service of process located at 1127 Broadway Street NE Ste 310, Salem, OR 97301. It operates 39 hospitals and more than 700 medical offices, with over 300,000 personnel, including more than 87,000 physicians and nurses across the country.

29.2.    Defendant, Greg Adams, was at all times pertinent, the Chief Executive Officer and PolicyMaker of Kaiser Foundation Hospitals and was aware and responsible for duties owed to Plaintiffs under the organization's FWA, IRB, CDC COVID-19 Vaccination Program Provider Agreement on behalf of Kaiser. Mr. Adams is named as a defendant in his official and individual capacities.

29.3.    Defendant, Andrew Bindman, MD, was at all times pertinent, the Chief Medical Officer and PolicyMaker of Kaiser Foundation Hospitals and was aware and responsible for duties owed to Plaintiffs under the organization's FWA, IRB, CDC COVID-19 Vaccination Program Provider Agreement on behalf of Kaiser. Dr. Bindman is named as a defendant in his official and individual capacities.

## V.    HISTORY AND FACTS

30.    Plaintiffs make no assertions regarding whether it is lawful for a public or private entity to mandate a **_licensed_** vaccine. Plaintiffs' allegations herein only relate to Defendants' applying their vaccine mandate to the compulsory use of drugs, biologics, and devices under 21 U.S.C. §360bbb-3 (the EUA statute) and the PREP Act.

31.     The laws regulating the investigational new drug (IND) industry were largely created after Senator Edward Kennedy held live hearings in 1973 detailing the industry's abuses against the American people. In 1974, Congress enacted the National Research Act[4] in response to those hearings, establishing laws, regulations, and mandatory guidelines to protect Americans from future abuses. However, the industry has been internally regulated and enforced via various federal and state agencies since 1974. This internal enforcement has denied the judiciary from acquiring knowledge of the laws discussed herein. To ensure Plaintiffs secure equitable justice, the court is provided with an understanding of those laws.

32.     The 1974 National Research Act established the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research[5] (hereinafter referred to as the "Commission").

33.     Congress required the Commission to:

A.   "conduct a comprehensive investigation and study to identify the basic ethical principles which should underlie the conduct of biomedical and behavioral research involving human subjects,"

B.   "develop guidelines which should be followed in such research to assure that it is conducted in accordance with such principles," and

C.   "make recommendations to the [HHS] Secretary" for "such administrative action as may be appropriate to apply such guidelines to biomedical and behavioral research conducted or supported under programs administered by the Secretary."

34.     Congress further required the Commission to consider "the nature and definition of informed consent in various research settings."[6]

---

[4] Public Law 93-348 - July 12, 1974 National Research Act
[5] Title II of the National Research Act, Public Law 93 - 348-July 12, 1974 - https://www.govinfo.gov/content/pkg/STATUTE-88/pdf/STATUTE-88-Pg342.pdf
[6] National Research Act Title II - PROTECTION OF HUMAN SUBJECTS OF BIOMEDICAL AND BEHAVORIAL RESEARCH Part A Section 202. (a)(1)(B)(iv)

35.    On April 18, 1979, the Commission published its findings in the Federal Register in a report titled, "The Belmont Report."[7]

A.    **The Belmont Report**

36.    The Belmont Report outlined what the Commission considered "the nature and definition of informed consent" as follows:

    A.    "An autonomous person is an individual capable of deliberation about personal goals and acting under the direction of such deliberation. To respect autonomy is to give weight to autonomous persons ʹconsidered opinions and choices <u>while refraining from obstructing their actions</u>…" (Emphasis added);

    B.    "To show lack of Respect for an autonomous agent is to repudiate that personʹs considered judgments, <u>to deny an individual the freedom to act on those considered judgments</u>…"(Emphasis added);

    C.    "Respect for persons requires subjects, to the degree that they are capable, be given the opportunity to choose what shall or shall not happen to them. This opportunity is provided when <u>adequate standards for informed consent are satisfied</u>" (Emphasis added).

37.    The Belmont Report defined those adequate standards of informed consent as follows:

    A.    An agreement to participate in research constitutes valid consent <u>only if voluntarily given</u>. <u>This element</u> of informed consent <u>requires conditions free of coercion and undue influence</u>; (Emphasis added)

    B.    Coercion occurs when an overt threat of harm is intentionally presented by one person to another in order to obtain compliance;

    C.    Undue influence, by contrast, occurs through an offer of an excessive, unwarranted, inappropriate, or improper reward or other overture in order to obtain compliance. Also, inducements that would ordinarily be acceptable may become undue influences if the subject is especially vulnerable;

---

[7] The National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research. - Belmont Report. Colorado, DC: U.S. Department of Health and Human Services,1979

D.  Unjustifiable pressures usually occur when persons in positions of authority or commanding influence -- especially where possible sanctions are involved -- urge a course of action for a subject," (emphasis added), and;

E.  …undue influence would include actions such as manipulating a person's choice through the controlling influence of a close relative and threatening to withdraw health services to which an individual would otherwise be entitled.

38.    The Commission determined that if an individual is under outside pressure to participate in an investigational medical activity, then obtaining that individual's informed consent was legally impossible.

39.    Congress mandated in the National Research Act that "[i]f the Secretary determines that administrative action recommended by the Commission should be undertaken by him, he shall undertake such action as expeditiously as is feasible."

40.    Congress required the HHS Secretary to act upon the Commission's recommendations as outlined in the Belmont Report by establishing regulations to protect humans involved in biomedical research activities. **Therefore, given the complexity, the intent of Congress was not to draft those laws but to allow the HHS Secretary to promulgate regulations on its behalf** to protect humans involved with investigational drugs. Therefore, these regulations are unique in that they were expressly requested by Congress to fulfill the intent of Congress via the National Research Act.

41.    In the early 1980s, HHS acted upon the Commission's recommendations, stating, "Based on the Belmont Report and other work of the National Commission, HHS revised and

expanded its regulations for protecting human subjects…The HHS regulations are codified at 45 Code of Federal Regulations (CFR) 46, subparts A through D."[8]

**B.    45 CFR Part 46**

42.    45 CFR Part 46 is entitled, "Protection of Human Subjects." Subpart A is entitled, "Basic HHS Policy for Protection of Human Research Subjects" and establishes that (a) the policy (for protection of human research subjects) "applies to **all research**[9] involving human subjects conducted, supported, or otherwise subject to regulation by any Federal department or agency..." (Emphasis added).[10]

43.    HHS designed a very broad definition of research when, at 45 CFR § 46.102 (Definitions): "Research means a systematic investigation, including research development, testing, and evaluation, designed to develop or contribute to generalizable knowledge. Activities that meet this definition constitute research for purposes of this policy, whether or not they are conducted or supported under a program that is considered research for other purposes"[11] (emphasis added). Research under this policy includes medical chart reviews by students or periodic studies of medical products under 21 U.S.C. §360bb-3 authorization.[12]

44.    A "human subject" is broadly defined as (1) a living individual, (2) from whom data is obtained and used,[13] and (3) from whom identifiable private information is known.[14]

---

[8] 45 CFR 46 FAQs. HHS.gov. Published 2018. Accessed May 18, 2023. https://www.hhs.gov/ohrp/regulations-and-policy/guidance/faq/45-cfr-46/index.html

[9] Research under 45 CFR Part 46 includes clinical trials but is not limited in scope to only clinical trials. College students studying medical charts of patients constitutes "research" requiring 45 CFR Part 46 adherence.

[10] 45 CFR 46.101(a)

[11] 45 CFR 46.102(l)

[12] https://www.hhs.gov/ohrp/sites/default/files/human-subject-regulations-decision-charts-2018-requirements.pdf

[13] 45 CFR 46.102(e)(1)(i)

[14] 45 CFR 46.102(e)(1)(ii)

45.    HHS regulations define[15] the term "human subject" at 45 CFR 46.102(e) as follows:

(1) ***Human subject*** means a living individual about whom an investigator (whether professional or student) conducting research:

(i) Obtains information or biospecimens through intervention or interaction with the individual, and, uses, studies, or analyzes the information or biospecimens; or

(ii) Obtains, uses, studies, analyzes, or generates identifiable private information or identifiable biospecimens.

(2) ***Intervention*** includes physical procedures by which information or biospecimens are gathered (*e.g.,* venipuncture) and manipulations of the subject or the subject's environment that are performed for research purposes.

(3) ***Interaction*** includes communication or interpersonal contact between investigator and subject.

(4) ***Private information*** includes information about behavior that occurs in a context in which an individual can reasonably expect that no observation or recording is taking place, and information that has been provided for specific purposes by an individual and that the individual can reasonably expect will not be made public (e.g., a medical record).

(5) ***Identifiable private information*** is private information for which the identity of the subject is or may readily be ascertained by the investigator or is associated with the information.

(6) ***An identifiable biospecimen*** is a biospecimen for which the identity of the subject is or may readily be ascertained by the investigator or is associated with the biospecimen. (Emphasis in original.)

46.    Congress drafted broad definitions for "research and "subjects" to comply with the recommendations of the Belmont Report, which declared that "the general rule is that if there is any element of research in an activity, that activity should undergo review (third-party review to

---

[15] "Coded Private Information or Biospecimens Used in Research (2018)." HHS.gov. Published January 19, 2018. https://www.hhs.gov/ohrp/coded-private-information-or-biospecimens-used-research.html#:~:text=Identifiable%20private%20information%20is%20private,is%20associated%20with%20the%20information (Last accessed June 5, 2023)

ensure the health and rights of involved individuals are protected) for the protection of human subjects"[16] (emphasis added).

47.     Therefore, if individuals are administered an investigational medical product and their private identifiable information is collected along with the details about their interaction with the product, and that information is monitored, studied, or analyzed for purposes of adding to the generalizable knowledge of the product, then the activity meets the definition of "research," requiring 45 CFR Part 46 compliance when the federal government is involved.

48.     HHS ensured that all research activities involving the federal government must comply with Belmont Report's ethical requirements: (1) "Department or agency heads retain final judgment as to whether a particular activity is covered by this policy, and this judgment shall be exercised consistent with the ethical principles of the Belmont Report"[17] (emphasis added), (2) if the activity is considered exempt from the policy, then "the alternative procedures to be followed are consistent with the principles of the Belmont Report."[18]

49.     Congress expressly prohibits the federal government from administering an investigational product to an individual without complying with the Belmont Report's ethical principles and 45 CFR § 46.101, *et seq*.

50.     Placing an individual under a "sanction" for refusing an EUA drug, biologic, or device patently violates the ethical principles of the Belmont Report.

---

[16] The Belmont Report Part A: Boundaries Between Practice & Research. "Research and practice may be carried on together when research is designed to evaluate the safety and efficacy of a therapy. This need not cause any confusion regarding whether or not the activity requires review; the general rule is that if there is any element of research in an activity, that activity should undergo review for the protection of human subjects."

[17] 45 CFR § 46.101(c)

[18] 45 CFR § 46.101(i)

51.    The intent of Congress was to give the Belmont Report the force of law through 45 CFR § 46.101, *et seq.* and the Federal Wide Assurance agreement (see discussion, *infra*) for the explicit purpose of protecting humans when they are offered a federally funded EUA investigational product.

52.    To further protect Americans from medical research abuses in the future, Congress declared that, "Federal funds administered by a Federal department or agency may not be expended for research involving human subjects unless the requirements of this policy have been satisfied."[19] (45 CFR § 46.122)

53.    Moreover, Congress also prohibited the United States Military from abusing individuals again by enacting 10 U.S.C. § 980(a), which provides in pertinent part, "Funds appropriated to the Department of Defense may not be used for research involving a human being as an experimental subject unless — (1) the informed consent of the subject is obtained in advance."

54.    Therefore, pursuant to 45 CFR § 46.101, *et seq.*, "research" occurs when an individual is administered an investigational drug, the individual's private identifiable information is known, and data collected regarding their interaction with the drug is added to the generalizable knowledge about the drug.

55.    The COVID-19 CDC Vaccination Program is a research activity requiring 45 CFR § 46.101, *et seq.* compliance as well as each COVID-19 EUA's Scope of Authorization. (See *infra*)

---

[19] All COVID-19 EUA drugs and their administration have been fully funded by the federal government, requiring 45 CFR Part 46 adherence.

56.     At no time may the federal government offer or administer an investigational medical product to an individual if their "legally effective informed consent" is not obtained in advance.

### C.     Legally Effective Informed Consent

57.     45 CFR § 46.116 sets forth the Belmont Report's "adequate standards" of informed consent[20], and they include, but are not limited to:

(a)(1)    Before involving a human subject in research covered by this policy, an investigator shall obtain the legally effective informed consent of the subject or the subject's legally authorized representative; (Emphasis added)

(a)(2)    An investigator shall seek informed consent only under circumstances that provide the prospective subject or the legally authorized representative sufficient opportunity to discuss and consider whether or not to participate and that minimize the possibility of coercion or undue influence; (Emphasis added)

(a)(3)    The information that is given to the subject or the legally authorized representative shall be in language understandable to the subject;

(a)(4)    The prospective subject or the legally authorized representative must be provided with the information that a reasonable person would want to have in order to make an informed decision about whether to participate, and an opportunity to discuss that information;

(a)(5)    Informed consent must begin with a concise and focused presentation of the key information that is most likely to assist a prospective subject or legally authorized representative in understanding the reasons why one might or might not want to participate in the research;

(a)(6)    No informed consent may include any exculpatory language through which the subject or the legally authorized representative is made to waive or appear to waive any of the subject's legal rights;

---

[20] The Belmont Report and 45 CFR §46.116 contain the only definition for what Congress deems legally effective informed consent. Therefore, when statutes explicitly or implicitly mandate a person to give their legally effective informed consent, these definitions must be understood as the intent of Congress for compliance purposes.

(a)(7)    For research involving more than minimal risk, an explanation as to whether any compensation and an explanation as to whether any medical treatments are available if injury occurs…;

(a)(8)    A statement that participation is voluntary, refusal to participate <u>will involve no penalty or loss of benefits to which the subject is otherwise entitled</u>, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled. (Emphasis added)

58.    Legally Effective Informed Consent, according to the Belmont Report, can be broken down into its basic formula as:

A. the individual <u>must not be</u> under outside pressure to participate,

B. the only reason an individual participates is that he or she believes the product may benefit their personal health goals, and

C. the conditions of 1 and 2 are established before the individual participates in the investigational product.

59.    Only when authorities comply with 45 CFR § 46.101, *et seq.* and the ethical principles of the Belmont Report can an opportunity exist for an individual to give their legally effective informed consent according to 45 CFR § 46.116(a)(1).

60.    Informed Consent must be legally effective and prospective, according to HHS.

61.    45 CFR Part 46 applies to all federal agencies, departments, and the military (45 CFR § 46.101(a)). Additionally, twenty federal agencies incorporated 45 CFR Part 46 specifically into their regulatory framework.[21]

62.    Through the Federal Wide Assurance (FWA) agreement (see *infra*), all U.S. States and Territories (i.e., state health agencies have FWA agreements) have agreed to obtain the legally

---

[21] https://www.hhs.gov/ohrp/regulations-and-policy/regulations/common-rule/index.html

effective informed consent of individuals when involving them in investigational medical products.

63.     Consensual medical experimentation involving investigational medical products can only exist under conditions that ensure individuals are free from outside pressures to participate.

64.     Therefore, individuals have the explicit right to refuse an investigational drug, biologic, or device without incurring a penalty or loss of benefits to which they are otherwise entitled.

65.     When Defendants penalized Plaintiffs for refusing to inject a 21 U.S.C. §360bbb-3 investigational drug into their bodies, Defendants breached their fiduciary and statutory duties to obtain Plaintiffs' legally effective informed consent. (See *infra*)

### D.     ICCPR Treaty

66.     In 1992, the United States Senate ratified the International Covenant on Civil and Political Rights Treaty (ICCPR).[22] Article VII states, "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. In particular, <u>no one shall be subjected without his free consent to medical or scientific experimentation.</u>" (Emphasis added)

67.     Subjected means to be under the rule of law by one's authority.

68.     Free consent means to be free from outside pressures to participate.

---

[22] Treaty Document 95-20 - INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS. (2023, May 19). https://www.congress.gov/treaty-document/95th-congress/20/all-info

COMPLAINT                                        21

69.     The U.S. Senate issued a resolution stating, "That the United States considers itself bound by Article 7 to the extent that 'cruel, inhuman or degrading treatment or punishment' means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth and/or Fourteenth Amendments to the Constitution of the United States."[23]

70.     The U.S. Senate considered it to be a violation of Article 7 of the ICCPR Treaty and the 5th Amendment's Due Process Clause if individuals were forced to forfeit liberty and property without due process for refusing medical experimentation.  The Senate also considered it to be a violation of Article 7 of the ICCPR Treaty and the 14th Amendment's Equal Protection Clause when individuals who refused medical experimentation were treated differently than those who accepted medical experimentation.

71.     The United States Senate stated that Articles One through Twenty-Seven of the ICCPR Treaty are not "self-executing" but "that it is the view of the United States that States Party to the Covenant should, wherever possible, refrain from imposing any restrictions or limitations on the exercise of the rights recognized and protected by the Covenant, even when such restrictions and limitations are permissible under the terms of the Covenant."

72.     Treatment by authorities debasing an individual's liberty, autonomy, and human dignity for the express purpose of coercing that individual to surrender their Constitutional rights,

---

[23] See "Resolution" – Treaty Document 95-20 - INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS. Congress.gov. Published 2023. Accessed June 5, 2023. https://www.congress.gov/treaty-document/95th-congress/20/all-info

leading to feelings of fear, anguish, and inferiority, meets the international definition of cruel, inhumane, and degrading treatment or punishment.[24]

73.     Whereas the "United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment" treaty deals specifically with physical torture or the threat of physical torture, Article VII of the ICCPR Treaty speaks to the political actions of governments and the laws of governments leading to a loss of rights, safety, and liberty, or the feelings that such actions will lead to those losses.

74.     The UN Human Rights Committee spoke to Article IV of the ICCPR Treaty regarding the derogation of rights when states declare an emergency. "Article 4, paragraph 2, of the Covenant explicitly prescribes that no derogation from the following articles may be made: article 6 (right to life), article 7 (prohibition of torture or cruel, inhuman or degrading punishment, or of medical or scientific experimentation without consent.)"[25] (Emphasis added.)

75.     Article 4.2 of the ICCPR Treaty established the restriction of derogation of informed consent rights as a peremptory norm.  Although Article VII of the ICCPR Treaty does not provide a private right of action, it is nonetheless enforceable under 42 U.S.C. § 1983 because the treaty contains unambiguous rights enforceable language specific to the individual involved in experimental medical products or processes.

---

[24] "Treatment that humiliates or debases an individual, showing a lack of respect for, or diminishing, their human dignity, or when it arouses feelings of fear, anguish or inferiority capable of breaking an individual's moral and physical resistance." - degrading treatment or punishment. Published 2023. Accessed June 6, 2023. https://home-affairs.ec.europa.eu/networks/european-migration-network-emn/emn-asylum-and-migration-glossary/glossary/degrading-treatment-or-punishment_en

[25] "No justification or extenuating circumstances may be invoked to excuse a violation of article 7 for any reasons, including those based on an order from a superior officer or public authority." - Human Rights Committee in its General Comment No. 20 on article 7 (A/44/40)

E.    **HHS EUA Precedent**

76.    On January 28, 2005, HHS issued the first EUA[26] under its new Section 564 authority (i.e., 21 USC 360bbb-3). The military requested EUA protocols for Anthrax Vaccine Adsorbed (AVA), to be utilized by civilians and service members. HHS stated, "The issuance of this Authorization for the emergency use of AVA is the first time that the EUA authority is being used. FDA intends to explain clearly the reasons for each issuance, termination, or revocation of an EUA. The agency wishes to make its decision-making understandable to help ensure that members of the public, and particularly those individuals who may be eligible to receive a medical product authorized for emergency use, are informed about the basis of an EUA determination."

77.    HHS mandated that individuals participating in the AVA investigational product must be informed of the following statements:

A.    <u>Individuals</u> (<u>service members and civilians</u>) who refuse anthrax vaccination will not be punished. (Emphasis added)

B.    Refusal may not be grounds for any disciplinary action under the Uniform Code of Military Justice.

C.    Refusal may not be grounds for any adverse personnel action. Nor would either military or civilian personnel be considered non-deployable or processed for separation based on refusal of anthrax vaccination.

D.    There may be no penalty or loss of entitlement for refusing anthrax vaccination,

E.    This information shall read in the trifold brochure provided to potential vaccine recipients as follows: You may refuse anthrax vaccination under the EUA, and you will not be punished. No disciplinary action or adverse personnel action will be taken. You will not be processed for separation, and you will still be deployable.

---

[26] https://www.govinfo.gov/content/pkg/FR-2005-02-02/pdf/05-2028.pdf

> There will be no penalty or loss of entitlement for refusing anthrax vaccination.[27]

78.     The explicit instructions in the EUA language directly relate to AVA's classification as an investigational new drug not licensed by the FDA for any legal indication. Moreover, the language was designed to ensure that healthcare professionals could obtain the legally effective informed consent of the individual because it expressly informed the individual that no "sanction" would be imputed for refusal, thus nullifying all outside pressures to participate. No amendments to Section 564 have altered its requirements since HHS issued this first EUA.

79.     The reason HHS was crystal clear about an individual's right to refuse an investigational drug was to respect court orders and the express authority of individuals to choose the available statutory options.

**F.     <u>Judicial EUA Precedent</u>**

80.     On October 27, 2004, U.S. District Court Judge Sullivan spoke to the individual's authority to refuse investigational drugs without consequence when he held in *Doe v. Rumsfeld*, 341 F. Supp. 2d 1 (D.D.C. 2004), that:

> A.     Congress has prohibited the administration of investigational drugs to service members without their consent. This Court will not permit the government to circumvent this requirement; and,
>
> B.     Unless and until FDA properly classifies AVA [an anthrax vaccine] as a safe and effective drug for its intended use, an injunction shall remain in effect prohibiting defendants' use of AVA on the basis that the vaccine is either a drug unapproved for its intended use or an investigational new drug within the meaning of 10 U.S.C. §1107. Accordingly, the involuntary anthrax vaccination program, <u>as applied to all persons</u>, is rendered illegal absent informed consent or a Presidential waiver. (Emphasis added.)

---

[27] Federal Register/Vol. 70, No. 21/Wednesday, February 2, 2005/Notices 5455 IV Conditions of Authorization

81.     Immediately upon Judge Sullivan's ruling, the Department of Defense ended all punitive activities against service members and civilian employees because the federal court affirmed the individual's statutory authority to refuse investigational drugs without consequence. Except for 10 U.S.C. § 1107, the laws leading Judge Sullivan to his ruling apply to individuals irrespective of civilian or military service.  No laws have changed to negate Judge Sullivan's 2004 ruling.

82.     Judge Sullivan added clarity to the importance of what was argued before the court by stating: "The Court is persuaded that the right to bodily integrity and the importance of complying with legal requirements, even in the face of requirements that may potentially be inconvenient or burdensome, are among the highest public policy concerns one could articulate." *Doe v. Rumsfeld*, 341 F. Supp. 2d 1 (D.D.C. 2004).

83.     *Doe* and the HHS provide judicial and administrative precedent affirming the right of individuals to refuse investigational products without incurring a penalty or losing a benefit to which they are otherwise entitled. Nothing in the law has changed to nullify that right since those precedents were firmly established.

## G.     Federal Wide Assurance (FWA)

84.     In 2001, HHS created the Office of Human Rights Protection (OHRP), which established the Federal Wide Assurance (FWA) agreement. The FWA is an agreement by entities conducting business with HHS to comply with 45 CFR 46 and the Belmont Report's ethical guidelines.

85.     HHS states, "The Federal Wide Assurance (FWA) is an assurance of compliance with the U.S. federal regulations for the protection of human subjects in research. It is approved by the Office for Human Research Protections (OHRP) for all human subjects research conducted

COMPLAINT                                    26

or supported by the U.S. Department of Health and Human Services (HHS). The FWA is also approved by OHRP for federal wide use, which means that other U.S. federal departments and agencies that have adopted the U.S. Federal Policy for the Protection of Human Subjects (also known as the Common Rule) may rely upon the FWA for the research they conduct or support. An FWA is the only type of assurance currently accepted and approved by OHRP. It is required whenever an Institution becomes engaged in human subjects research conducted or supported by any U.S. federal department or agency that has adopted the Common Rule…"[28]

86.    The OHRP assigns an FWA identification number to entities (hereinafter referred to as "Contracting Provider") that fulfill application requirements.

87.    An FWA identification number is issued only after the legally binding agreement between the Contracting Provider and the United States government has been signed.

88.    The FWA's main purpose is to benefit a third-party beneficiary because the FWA agreement authorizes the Contracting Provider to participate in federally funded programs involving humans with investigational drugs if, and only if, the Contracting Provider agrees to protect the health and legal rights of the third-party beneficiaries (i.e., humans who are administered investigational drugs, biologics, or devices under the research conditions described above).

89.    The fact that the entire FWA agreement hinges upon the intended rights of third-party beneficiaries means that Contracting Providers have a fiduciary duty to the third-party beneficiaries under the terms of the FWA agreement.

---

[28] Office for Human Research Protections. Federal Wide Assurance Instructions. HHS.gov. Published January 7, 2011. Last accessed May 19, 2023.

90.    The intended benefit to the third-party beneficiary is the right to accept or refuse participation in investigational products, clinical trials, and other research activities without fearing consequences for refusal and to know that independent Institutional Review Boards will provide oversight, ensuring their health, safety, and rights are protected.

91.    Although the third-party beneficiaries are not signatories to the contract, they are the intended third-party beneficiaries of the agreement, and their rights were violated the moment Defendants penalized Plaintiffs for refusing to take EUA products (i.e., investigational drugs, and testing articles).

92.    The FWA agreement requires the Contracting Provider to ensure that no third-party beneficiary is under outside pressure to participate in an investigational drug, biologic, or medical device.

93.    The FWA agreement requires Defendants to assure potential participants that they will not incur a penalty or lose a benefit to which they are otherwise entitled when refusing participation.[29]

94.    The duty placed upon the Contracting Provider is owed to those who refuse as well as those who accept the administration of investigational drugs.

95.    Therefore, when Defendants punished Plaintiffs (third-party beneficiaries) for refusing the administration of an investigational drug, they:

    A.        activated the terms and conditions of the contract,

    B.        violated the terms of the contract, causing injury to the legal rights of the third-party beneficiary,

---

[29] "The Federal Wide Assurance (FWA) is the only type of assurance currently accepted and approved by OHRP. Through the FWA, an institution commits to HHS that it will comply with the requirements in the HHS Protection of Human Subjects regulations at 45 CFR part 46." - HHS. 45 CFR 46.116(b)(8) requires the individual to be informed they will not be penalized for refusing participation in a research activity.

C.      created a cause of action for breach of fiduciary duty in favor of the third-party beneficiary.

96.     The Fourteenth Amendment's Equal Protection Clause provides additional protections by requiring all persons involved in federally funded COVID-19 countermeasure programs to be treated equally before the law, irrespective of the chosen option.

**H.    CDC COVID-19 Vaccination Program Provider Agreement**

97.     At all times pertinent, The Centers for Disease Control (CDC) stated:

> "At this time, **all COVID-19 vaccine in the United States has been purchased by the U.S. government** (USG) for administration exclusively by providers enrolled in the CDC COVID-19 Vaccination Program and remains U.S. government property until administered to the recipient. Only healthcare professionals enrolled through a health practice or organization as vaccination providers in the CDC COVID-19 Vaccination Program (and authorized entities engaged in shipment for the Program) are authorized to lawfully possess, distribute, deliver, administer, receive shipments of, or use USG-purchased COVID-19 vaccine. Other possession, distribution, delivery, administration, shipment receipt, or use of COVID-19 vaccine outside the parameters of the Program constitutes, at a minimum, theft under 18 U.S.C. § 641, and violation of other federal civil and criminal laws. Violators are subject to prosecution to the full extent of the law."[30]

98.     Although the program states it is a "Vaccination Program" (hereinafter referred to as "CDC Vaccination Program"), the federal government did not distribute any FDA-licensed COVID-19 vaccines. Instead, it has relied exclusively on unlicensed COVID-19 EUA drugs for the program's administration.

99.     Before the CDC accepts a person or entity as a Provider in the CDC Vaccination Program, that person or entity is required to sign the CDC COVID-19 Vaccination Program Provider Agreement.[31]

---

[30] See Exhibit A, Provider Agreement
[31] *Id*.

100.    The Provider Agreement informs the person or entity that, "Your Organization's chief medical officer (or equivalent) and chief executive officer (or chief fiduciary)—collectively, Responsible Officers—must complete and sign the CDC COVID-19 Vaccination Program Provider Requirements and Legal Agreement (Section A)."[32]

101.    The Provider Agreement requires the organization to assign a person or persons who will be under a legal obligation to ensure the program is carried out effectively, declaring, "For the purposes of this agreement, in addition to Organization, Responsible Officers named below will also be accountable for compliance with the conditions specified in this agreement. The individuals listed below must provide their signature after reviewing the agreement requirements."

102.    "This program is a part of collaboration under the relevant state, local, or territorial immunization's cooperative agreement with CDC. To receive one or more of the publicly funded COVID-19 vaccines (COVID-19 Vaccine), constituent products, and ancillary supplies at no cost, Organization agrees that it will adhere to the following requirements…" (Emphasis added).

103.    Therefore, the CDC clearly states that the Provider Agreement works in conjunction with "relevant state" and other municipality immunization agreements.

104.    This requirement denotes state action involving private parties acting in the capacity of a state actor.

105.    President Biden was bound to 45 CFR Part 46, the Belmont Report, Article VII of the ICCPR Treaty, 21 U.S.C. §360bbb-3, and the PREP Act when he created a program to purchase all of the COVID-19 EUA drugs.

---

[32] *Id.*

106.    The purpose of the CDC going through the voluntary participation of States is because each state already had a Federal Wide Assurance agreement (see *supra*) in place requiring compliance with the same laws as a condition upon the State to access federal funding.

107.    HHS requires any entity conducting business with its organization to submit and be approved for a Federal Wide Assurance agreement (see discussion, *supra*) in advance of participating in any program involving humans with investigational drugs under its authority.

108.    The fact that the medical products in question are under an EUA does not exempt entities conducting business with HHS from first agreeing to obtain an FWA before participation.

109.    21 U.S.C. §360bbb-3 is a statute governing the administration of the unlicensed use of drugs, biologics, and devices authorized only for emergency use.

110.    The CDC COVID-19 Vaccination Program is a federally funded program designed to distribute investigational new drugs that were under 21 U.S.C. §360bbb-3 authorization. However, the federally funded program does not exempt persons from their duties under the statute, nor does the statute exempt persons from the HHS requirement to obtain an FWA before participating in its federally funded program.

111.    The federal government, its agencies and departments, and the military must comply with 45 CFR Part 465 and the Belmont Report anytime it involves a human with an investigational new drug, biologic, or device.

112.    While the Provider Agreement does not replace the laws and regulations governing any EUA drug classification, it adds an extra layer of legal obligations required of volunteer participants.

113.    The Provider Agreement requires that all volunteer participants:

      A.    must provide an approved Emergency Use Authorization (EUA) fact sheet or vaccine information statement (VIS), as required, to each

vaccine recipient, the adult caregiver accompanying the recipient, or other legal representative,

B.      Organization must report moderate and severe adverse events following vaccination to the Vaccine Adverse Event Reporting System (VAERS),

C.      Organization must comply with all applicable requirements as set forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine,

D.      Organization must administer COVID-19 Vaccine in compliance with all applicable state and territorial vaccination laws.

114.    The EUA Fact Sheet is required because the Executive Branch of the government is the sole sponsor of EUA products,[33] and federal law requires them to obtain the legally effective informed consent of each individual before the administration of the product.

115.    Moreover, the HHS Secretary requires each recipient to be given the Fact Sheet for each EUA COVID-19 investigational drug from which the federal branch of government cannot exempt itself.

116.    The required Fact Sheet acts as a function of the "informed consent" process for persons ascertaining whether or not they will participate in the EUA product.

117.    The Executive Branch is required to report adverse events as part of the government's COVID-19 Vaccination Program because federal law requires this of every EUA product, which the HHS Secretary echoed in each of the EUA letters issued to pharmaceutical companies.

---

[33] The Federal government chose to purchase and retain ownership of all EUA COVID-19 drugs. However, that ownership does not negate their legal obligations under Section 564.

118.    Moreover, the requirement to monitor, collect, and report, adverse reactions (research activities) from the drugs' use denotes how these products are governed by 45 CFR 46, requiring both IRB and Belmont Report compliance.

119.    The requirement that the "Organization must administer COVID-19 Vaccine in compliance with all applicable state and territorial vaccination laws" is because federal law declares:

A.    "This policy does not affect any state or local laws or regulations (including tribal law passed by the official governing body of an American Indian or Alaska Native tribe) that may otherwise be applicable and that provide additional protections for human subjects" (45 CFR 46.101(f));

B.    Additionally, federal law declares, "The informed consent requirements in this policy are not intended to preempt any applicable Federal, state, or local laws (including tribal laws passed by the official governing body of an American Indian or Alaska Native tribe) that require additional information to be disclosed in order for informed consent to be legally effective" (45 CFR 46.116(i));

C.    This policy does not affect any foreign laws or regulations that may otherwise be applicable and that provide additional protections to human subjects of research (45 CFR 46.101(g)).

120.    The Provider Agreement required Defendants to acknowledge the law before acceptance, as follows: "By signing this form, I certify that all relevant officers, directors, employees, and agents of Organization involved in handling COVID-19 Vaccine understand and will comply with the agreement requirements listed above…" (Emphasis added)

121.    Therefore, State governments and their authorized private parties agreed to participate in a joint effort to conduct research activities and obtain the legally effective informed consent of individuals on behalf of the United States Government when signing the CDC COVID-19 Vaccination Program Provider Agreement.

COMPLAINT                                    33

I.       **COVID-19 Research Activities**

122.     The State and public and private parties it authorizes for the CDC Vaccination Program are in a symbiotic relationship to conduct 45 CFR § 46.101, *et seq.* research activities pertaining to COVID-19 EUA drugs, biologics, and devices on behalf of the federal government. Moreover, they are in a symbiotic relationship to obtain legally effective informed consent from individuals offered participation in those experimental medical products.

123.     The federal government's Executive Branch purchased all COVID-19 EUA drugs and, in conjunction with the HHS Secretary[34] and the CDC, developed research activities that States and CDC Vaccination Program Providers must conduct on its behalf.

124.     Drugs, biologics, and devices authorized under 21 U.S.C. §360bbb-3 are classified by the FDA as investigational (experimental)[35],[36] according to their labeling. They have no legal indication to treat, cure, or prevent any disease according to their labeling.

125.     Moreover, if a product is already licensed by the FDA for the intended use under the declared emergency, the FDA is prohibited from issuing an EUA. (21 U.S.C. §360bbb-3(c)(3))

126.     At all times pertinent, the only COVID-19 drugs available to Plaintiffs for compliance with Defendant's COVID-19 Vaccine Policy were FDA-classified investigational new

---

[34] The EUA Scope of Authorization assigns research activities to the person acting on behalf of the manufacturer of the drug (the federal government who purchased all of the inventory), and to "emergency stakeholders," and "health care providers."

[35] Investigational new drug means, "A substance that has been tested in the laboratory and has been approved by the U.S. Food and Drug Administration (FDA) for testing in people…Also called experimental drug, IND, investigational agent, and investigational drug." NCI Dictionary of Cancer Terms. National Cancer Institute. Published 2023. Accessed June 25, 2023. https://www.cancer.gov/publications/dictionaries/cancer-terms/def/investigational-new-drug

[36] 21 CFR 312.3 21 CFR 312.3 (Definitions and Interpretations): See "Investigational new drug" and "Clinical investigation" Note that "clinical investigation" is distinct from "clinical trial." While all clinical trials are clinical investigations, not all clinical investigations are clinical trials.

drugs wholly owned by the federal government and only distributed through a federally funded program.

127.     A "marketed drug" is not the same as an "investigational drug."

128.     A "marketed drug" is one that is licensed by the FDA for general commercial marketing and approved with an indication and usage for the treatment of a particular disease, which, via federal statute, EUA medical countermeasure products must not be. (See 21 USC 355a, *et seq*, 21 USC 360bbb-3(a)(2)(a,b))

129.     Investigational new drugs are legally regulated entirely differently than licensed drugs.

130.     The FDA declared in its August 23, 2021 EUA to Pfizer that "Pfizer-BioNTech COVID-19 Vaccine" drug is legally distinct from its licensed "COMIRNATY" drug[37].

131.     The distinction lies within the drug's classifications as assigned to them by the FDA.  Those distinctions have <u>significant</u> legal consequences for the end user. (See discussion, *infra*)

132.     EUA drugs, by their statutory definitions, are not licensed by the FDA for general commercial marketing and have no legal indication to treat, cure, or prevent any known disease.

133.     Investigational drug "means a new drug or biological drug that is used in a clinical investigation." (21 CFR 312.3 "Investigational new drug")

---

[37] See Exhibit B, FDA EUA Letter to Pfizer, August 23, 2021

134.    Clinical investigation "means any experiment in which a drug is administered or dispensed to, or used involving, one or more human subjects. For the purposes of this part, <u>an experiment is any use of a drug except for the use of a marketed drug in the course of medical practice</u>." (21 CFR 312.3 "Clinical investigation") (Emphasis added).

135.    Only the FDA is authorized by Congress to assign a drug, biologic, or device its classification for purposes of regulation.

136.    Drugs are governed by their classification according to their labeling and not by their formulation.

137.    Congress explicitly enacted laws governing investigational new drugs to prevent the executive branch from continuing its history of abusing the rights of individuals who participate in federally funded investigational medical products.

138.    21 U.S.C. §360bbb-3 requires the Secretary of HHS to "[a]ppropriate conditions for the monitoring and reporting of adverse events associated with the emergency use of the product (research activity)."[38]

139.    The Secretary establishes the conditions under which the research activities will occur in each EUA letter, known as the Scope of Authorization.

---

[38] 21 U.S.C. §360bbb-3(e)(1)(A)(iii)

140.    As an example, on January 19, 2021 [39] the Secretary established mandatory conditions that Pfizer and emergency stakeholders (distributors, manufacturers, etc.) must follow, which involve 45 CFR 46 research activities.

141.    Under the EUA's "Conditions of Authorization," the Secretary mandates in part:

* * *

F.    Pfizer Inc. will report to Vaccine Adverse Event Reporting System (VAERS):

   • Serious adverse events
   • Cases of Multisystem Inflammatory Syndrome in children and adults
   • Cases of COVID-19 that result in hospitalization or death, that are reported to Pfizer, Inc.

G.    Pfizer Inc. must submit to Investigational New Drug application (IND) number 19736 periodic safety reports at monthly intervals, within 15 days after the last day of a month…Each periodic safety report is required to contain descriptive information which includes:

   • A narrative summary and analysis of adverse events submitted during the reporting interval, including interval and cumulative counts by age groups, special populations (e.g., pregnant women), and adverse events of special interest.
   • Newly identified safety concerns in the interval.

* * *

N.    Pfizer Inc. will conduct post-authorization observational study(ies) to evaluate the association between Pfizer-BioNTech COVID-19 Vaccine and a pre-specified list of adverse events of special interest, along with deaths and hospitalizations, and severe COVID-19. The study population should include individuals administered the

---

[39] Authorizations of Emergency Use of Two Biological Products During the COVID-19 Pandemic; Availability. Federal Register. Published January 19, 2021. Accessed June 7, 2023. https://www.federalregister.gov/documents/2021/01/19/2021-01022/authorizations-of-emergency-use-of-two-biological-products-during-the-covid-19-pandemic-availability

authorized Pfizer-BioNTech COVID-19 Vaccine under this EUA in the general U.S. population (16 years of age and older), populations of interest such as healthcare workers, pregnant women, immunocompromised individuals, subpopulations with specific comorbidities.

\* \* \*

T.  Vaccination providers administering Pfizer-BioNTech COVID-19 Vaccine must report the following information…to VAERS…:

• Serious adverse events
• Cases of Multisystem Inflammatory Syndrome in children and adults
• Cases of COVID-19 that result in hospitalization or death

142.  VAERS reported 1,562,008 entries from December 2020 through May 26, 2023, including 35,272 deaths (1.6 per hour) and 263,462 (12.11 per hour) serious injuries. These numbers demonstrate historical entries for a drug and the vast involvement of the medical community to add to the "generalizable knowledge" of the product.

143.  Healthcare providers and Pfizer, Moderna, and Janssen must identify the person receiving the product, monitor their involvement with the product, and report whether or not they had an adverse reaction to the product for the express purpose of adding to the generalizable knowledge of the product.

144.  COVID-19 drug manufacturers and government agencies use collected data to add to the generalizable knowledge about the product.

145.  These conditions meet 45 CFR 46, FWA, and the Belmont Report definitions of research activities.

146.    The CDC Provider Agreement (see discussion, *infra*), EUA authorizations, and CDC's Advisory Committee on Immunization Practices (ACIP) recommendations demonstrate how the nationwide COVID-19 vaccination program is to be systematically investigated.

147.    The federal government purchased all COVID-19 drugs and created the CDC COVID-19 Vaccination Provider Agreement for the administration of its property to individuals desiring to participate in the product.

148.    The Provider Agreement establishes additional research activities that Defendants must conduct on the government's behalf and "must administer COVID-19 Vaccine in accordance with all requirements and recommendations of CDC and CDC's Advisory Committee on Immunization Practices (ACIP)."

149.    ACIP's Morbidity and Mortality Weekly Report from September 2021 confirms that in addition to "initial clinical trial data, ACIP…considered…real-world vaccine effectiveness studies, and post-authorization vaccine safety monitoring," information came from entities that executed the CDC Vaccine Provider Agreement and submitted the below-described information because the ONLY way to have authority to administer the COVID-19 Vaccines is by executing the CDC Vaccine Provider Agreement.[40]

150.    The use of this information by ACIP demonstrates how the data collected "contributes to generalizable knowledge."

---

[40] ACIP, Morbidity and Mortality Weekly Report, "Use of Pfizer-BioNTech COVID-19 Vaccine in Persons Aged ≥ 16 Years: Recommendations of the Advisory Committee on Immunization Practices – United States, September 2021", Vol.70, No.38, p. 1344.

151.    The ACIP recommendations[41] referenced in Footnote 1 of the CDC Provider

Agreement[42] instruct Defendants to:

    A.    Provide an EUA Fact Sheet to potential recipients before being administered the drug.

    B.    Counsel potential vaccine recipients about expected systemic and local reactogenicity.

    C.    Follow additional clinical considerations, including details of administration and use in special populations (e.g., persons who are pregnant or immunocompromised or who have severe allergies) based on advice from the CDC (https://www.cdc.gov/vaccines/covid-19/info-by-manufacturer/ pfizer/clinical-considerations.html)

    D.    Adverse events that occur in a recipient after receipt of COVID-19 vaccine should be reported to the Vaccine Adverse Events Reporting System (VAERS).

    E.    Report vaccination administration errors, serious adverse events, cases of multisystem inflammatory syndrome, and cases of COVID-19 that result in hospitalization or death after administration of COVID-19 vaccine under EUA.

    F.    Report any clinically significant adverse event, whether or not it is clear that a vaccine caused the adverse event.

    G.    Inform vaccine recipients about V-Safe, the CDC's vaccine safety monitoring system that the CDC says "helps us monitor the safety of COVID-19 vaccines for everyone."[43]

---

[41] *Id.*, at 1347.

[42] The CDC Provider Agreement, at p.2, makes the ACIP Recommendations mandatory by the following language: "This agreement expressly incorporates all recommendations, requirements, and other guidance that this agreement specifically identifies through footnoted weblinks. Organization must monitor such identified guidance for updates. Organization must comply with such updates."  See Exhibit A, CDC COVID-19 Vaccination Program Provider Agreement (hereinafter "Provider Agreement").

[43] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/pdfs/v-safe-information-sheet-508c.pdf

152.    The CDC Provider Agreement further instructs Defendants:

A.    Within 24 hours of administering a dose of COVID-19 Vaccine, record in the vaccine recipient's record and report required information to the relevant state, local or territorial public health authority.

B.    Submit Vaccine-Administration Data through either (1) the immunization information system (IIS) of the state or local territorial jurisdiction or (2) another system designated by CDC according to CDC documentation and data requirements.

C.    Organization must preserve the record for at least 3 years following vaccination, or longer if required by state, local, or territorial law. Such records must be available to any federal, state, local, or territorial public health department to the extent authorized by law.

D.    Report the number of doses of COVID-19 Vaccine that were unused, spoiled, expired, or wasted as required by the relevant jurisdiction.

E.    Provide a completed COVID-19 vaccination record card to every COVID-19 vaccine recipient.

153.    Based on the detailed, organized, and methodical way HHS and the CDC structured the nationwide COVID-19 Vaccination Program, it meets the criteria for "a systematic investigation…<u>designed to develop or contribute to generalizable knowledge</u>."

154.    It cannot be reasonably argued that the required research activities under each COVID-19 EUA's Scope of Authorization and the CDC COVID-19 Vaccination Program Provider Agreement do not meet the conditions requiring 45 CFR § 46.101, *et seq*. compliance.

155.    The CDC COVID-19 Vaccination Program required the State to obtain individuals' private information and adverse events they experienced with the EUA drugs.

156.    The State could not delegate its functions to Defendants without requiring them also to conduct the research activities.

157.     The State accomplished this by requiring Defendants to sign the CDC COVID-19 Vaccination Program Provider Agreement.

158.     Therefore, it is an indisputable fact that the State owed Fourteenth Amendment obligations to persons considering participation in the federally funded program.

159.     Moreover, the State was bound to obtain individuals' legally effective informed consent.

160.     The State could not delegate that function of distributing the federal government's property without also delegating its legal and Constitutional duties to parties authorized to act on its behalf.

161.     Defendants were state actors, acting under color of law at all times pertinent. (See i*nfra*)

## VI.     FACTUAL ALLEGATIONS

### A.     Kaiser Foundation Hospitals

162.     Plaintiffs make no assertions regarding whether it is lawful for a public or private entity to mandate the use of a ***licensed*** vaccine. Plaintiffs' allegations herein only relate to Defendants' applying its COVID-19 Vaccination Policy (hereinafter referred to as "Policy") to the compulsory use of drugs, biologics, and devices under 21 U.S.C. §360bbb-3 (the EUA statute) and The PREP Act.

163.     Plaintiffs adamantly assert that an individual has the absolute Constitutional and federal statutory right to refuse the administration of an Emergency Use Authorization (EUA) drug (e.g., Pfizer BioNTech COVID-19 Vaccine), biologic, or device (e.g., EUA testing articles and

masks) without incurring a penalty or losing a benefit to which they are otherwise entitled. Moreover, such a right is not dependent upon a person seeking a religious or medical exemption.

164.    Plaintiffs assert that they have the Constitutional and federal statutory right to refuse administration of a drug or biologic granted expanded access protocols by the CDC under its assumed Emergency Use Instructions (EUI) (see *infra*) authority.

165.    Plaintiffs assert that they have the Constitutional and federal statutory right to refuse participation in any activity or product listed as a countermeasure under the PREP Act.

166.    Plaintiffs assert that Congress prohibits Defendants from establishing 21 U.S.C. §360bbb-3 and PREP Act conditions requiring Plaintiffs to surrender their statutory rights and Constitutional protections as a condition to enjoy the privileges and benefits offered by the State or Kaiser and Defendants.

167.    Kaiser Foundation Hospitals ("Kaiser") is a network of not-for-profit hospitals incorporated in California.

168.    Kaiser is licensed by the State of Oregon to conduct business under OAR 333-500-0040.

169.    Plaintiffs were licensed by the State of Oregon to work as healthcare providers.

170.    At all times pertinent, Plaintiffs were under the authority of Kaiser PolicyMakers and were employed at one of Kaiser Foundation's facilities in the State of Oregon.

171.    Kaiser PolicyMakers signed the CDC COVID-19 Vaccination Agreement, assured HHS it would comply with its FWA00025698 agreement, established institutional review boards

under 45 CFR Part 46 authority, and unlawfully instituted and enforced the Kaiser PolicyMakers' COVID-19 policy.

172.    Although Kaiser and its PolicyMakers, at other times and in other circumstances, are private parties, they acted under color of law when, as collaborators with the State of Oregon penalized Plaintiffs for refusing to inject the federal government's COVID-19 unlicensed EUA/PREP Act drugs into their bodies.

173.    The Supreme Court and the Ninth Circuit Court of Appeals utilize several tests to ascertain when a private party is engaged in state action. Kaiser Policymakers are state actors under those tests (see *infra*).

174.    On August 27, 2021, Kaiser Policymakers issued a new company COVID-19 policy[44] (hereinafter referred to as "Policy") that, as applied, violated federal law, and state law and deprived Plaintiffs of their statutory and Constitutional rights.

175.    The policy stated in part:

(1) Kaiser Permanente is requiring all employees be fully vaccinated for COVID-19 by September 30, 2021, or to submit proof of a qualifying medical or religious exemption. Those who are not vaccinated by September 30 will be placed on unpaid administrative leave for up to 60 days until they are fully vaccinated.

(2) Unvaccinated employees and those who have not provided proof of vaccination must follow workplace safety rules including routine proof of negative COVID-19 test results based on regional requirements.

(3) Employees who are not fully vaccinated or who do not have an approved exemption will no longer be eligible to continue employment and will be terminated" by December 01, 2021.

---

[44] Exhibit C, Kaiser's COVID-19 Policy

176.    From the date Defendants issued its requirement to become "vaccinated" against COVID-19 to the time it dropped its requirement, no COVID-19 drug licensed and classified by the FDA as a vaccine existed in commerce for general commercial marketing for Plaintiffs to comply with Defendants' mandate lawfully.

177.    Therefore, as a matter of law, Defendants issued a "vaccine" mandate but exclusively relied only on FDA-classified investigational new drugs wholly owned by the federal government and only distributed through a federally funded program, which Defendants could only lawfully offer under voluntary conditions.

178.    Therefore, as a matter of law, Plaintiffs were legally incapable of complying with Defendants' vaccine mandate because no such vaccine existed.

179.    As a matter of law, Defendants were not authorized by President Biden, the HHS Secretary, or the U.S. Congress to establish conditions regarding the administration of drugs wholly owned by the federal government, which were also under EUA and PREP Act authority.

180.    As a matter of law, Defendants were completely preempted (*see infra*) by the EUA statute and the PREP Act from creating a Policy that conflicts with the voluntary nature of the CDC COVID-19 Vaccination Program.

181.    The Policy, as applied, required Plaintiffs to unlawfully inject an EUA, EUI, or PREP Act medical product into their bodies by December 1, 2021 or be penalized and even be denied continued employment, in violation of federal law and Plaintiffs' Fourteenth Amendment guarantees (see *infra*).

182.    Defendants' Policy required Plaintiffs to wear a covered countermeasure or utilize an EUA investigational diagnostic testing article if they were exempt or not in compliance with the Policy, in violation of Plaintiffs' Constitutional and statutory rights (*see infra*).

COMPLAINT                                   45

183.    Moreover, no drug, testing article, or mask that was not under the federal authority of the PREP Act has been made available to Plaintiffs from the beginning of the COVID-19 Pandemic through the filing of this Complaint (*see infra*).

184.    Therefore, at all times pertinent, it is an irrefutable fact that Kaiser PolicyMakers relied exclusively on EUA, EUI, and PREP Act medical products for Plaintiffs to comply with its Policy mandate.

185.    After being presented with Defendants' ultimatum to inject one of the federal COVID-19 investigational drugs into their bodies, which were under either EUA/EUI/PREP Act, all Plaintiffs exercised their federally secured right to REFUSE that injection, at which time Defendants unlawfully penalized them by disciplining Plaintiffs and ultimately terminating their employment, thereby causing all Plaintiffs to sustain economic and emotional damages.

186.    Plaintiffs sustained financial, emotional, and legal damages directly related to Defendants depriving Plaintiffs of their Constitutional and federal statutory rights to be free from "sanctions," "coercion," "undue influence," and "unjustifiable pressures" when involved in a federally funded investigational drug, biologic, or device.

187.    Defendants enacted an unlawful COVID-19 Vaccination Policy[45] and then acted on that Policy as justification to engage in their illegal behavior. Therefore, the company Policy and State custom (see *infra*) were the sources by which Defendants deprived Plaintiffs of their Constitutional and statutory rights, leading to severe economic, emotional, and other damages.

---

[45] The Policy was unlawful because it established a compliance date before FDA-licensed vaccines existed in commerce.

B.     **Emergency Use Authorization (EUA**

188.     As a matter of law, Congress prohibits persons from introducing drugs and biologics into commerce before receiving an FDA marketing license.[46]

189.     However, for limited reasons of compassion, education, and emergency use, Congress provides a legal mechanism to allow persons to participate in the investigational and unlicensed use of drugs, biologics, and devices according to the product's labeling, known as "expanded access protocols."[47]

190.     "Unlicensed use" means the use of a medical product for a purpose not licensed by the FDA (legal indication, usage, and contraindications) according to the product's labeling.

191.     Investigational "means a new drug or biological drug that is used in a clinical investigation." (21 CFR 312.3 "Investigational new drug")

192.     Clinical investigation "means any experiment in which a drug is administered or dispensed to, or used involving, one or more human subjects. For the purposes of this part, an experiment is any use of a drug except for the use of a marketed drug in the course of medical practice." (21 CFR 312.3 "Clinical investigation")

193.     A drug manufacturer may promote a licensed product only according to its legal indication and uses.[48]

---

[46] "No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) is effective with respect to such drug." 21 U.S.C. § 355(a)

[47] 21 U.S.C. § 360bbb *et. seq.* Short Title: "Expanded Access to Unapproved Therapies and Diagnostics"

[48] "Under the provisions of the Food, Drug and Cosmetic Act, a company must specify the intended uses of a product in its new drug application to FDA. Once approved, the drug may not be marketed or promoted for so-called 'off-label' uses – *i.e.*, any use not specified in an application and approved by FDA. Pfizer promoted the sale of Bextra for several uses and dosages that the FDA specifically declined to approve due to safety concerns. The company will pay a criminal fine of

COMPLAINT                                        47

194.    Only the FDA can assign a drug, biologic, or device its legal indication and classification.

195.    Moreover, a drug, biologic, or device is legally governed by its classification and FDA-licensed indication, usage, and contraindication.

196.    A drug or biologic is never governed by its formulation.

197.    Congress expressly authorized only the HHS Secretary to authorize expanded access protocols for the investigational and unlicensed use of drugs, biologics, and devices.[49]

198.    Congress enacted Project Bioshield[50] in 2004, establishing emergency expanded access protocols[51] for the investigational and unlicensed emergency use of drugs, biologics, and devices for large populations.

199.    Medical products authorized under 21 U.S.C. §360bbb-3 are known as medical countermeasures (MCMs)[52] and are exempt from 21 U.S.C. § 355(a) during the declared emergency.

200.    A drug or biologic under EUA/EUI is considered investigational, and, as a matter of law, it cannot have a licensed indication for its emergency use.[53]

---

$1.195 billion, the largest criminal fine ever imposed in the United States for any matter." - Justice Department Announces Largest Health Care Fraud Settlement in Its History. Justice.gov. Published September 2, 2009. Accessed November 12, 2023. https://www.justice.gov/opa/pr/justice-department-announces-largest-health-care-fraud-settlement-its-history

[49] 21 U.S.C. §360bbb(a)

[50] https://www.govinfo.gov/content/pkg/PLAW-108publ276/pdf/PLAW-108publ276.pdf

[51] 21 U.S.C. § 360bbb-3

[52] National Defense Authorization Act 2004 TITLE XVI—DEFENSE BIOMEDICAL COUNTERMEASURES https://www.govinfo.gov/content/pkg/PLAW-108publ136/pdf/PLAW-108publ136.pdf

[53] 21 U.S.C. §360bbb-3(a)(2)(A,B)

201.    On December 11, 2020, the FDA issued to Pfizer-BioNTech the first COVID-19 EUA for its investigational drug (officially named Pfizer-BioNTech COVID-19 Vaccine[54]), and the FDA confirmed that Pfizer's product "is an investigational vaccine not licensed for any indication."[55]

202.    On December 18, 2020, the FDA issued to ModernaTX, Inc., an EUA for its investigational drug (officially named Moderna COVID-19 Vaccine), and the FDA confirmed that Moderna's product "is an investigational vaccine not licensed for any indication."[56]

203.    On February 27, 2021, the FDA issued to Janssen Biotech, Inc., an EUA for its investigational drug (officially named Janssen COVID-19 Vaccine), and the FDA confirmed that Janssen's product "is an investigational vaccine not licensed for any indication."[57]

204.    Congress requires the HHS Secretary to establish the Scope of Authorization[58] for MCMs, determine the conditions by which persons can participate in an activity (e.g., manufacturing, distribution, administration, use/participation) and access the product,[59] and then publish the Scope of Authorization in the Federal Register[60] for public notice.

---

[54] *Id*. The FDA improperly allowed Pfizer to add the word "Vaccine" to its investigational name. The court should not confuse this name to mean the drug's legal indication. Pfizer-BioNTech COVID-19 Vaccine is an investigational drug having no legal indication to treat, cure, or prevent any known disease. The FDA classified the drug as an "investigational new drug" under investigational new drug application number 19736.
[55] 86 Fed.Reg. 5200, Jan. 19, 2021
[56] 86 Fed.Reg. 5200, Jan. 19, 2021
[57] 86 Fed.Reg. 28608, May 27, 2021
[58] 21 U.S.C. §360bbb-3(d)
[59] 21 U.S.C. §360bbb-3(e)
[60] 21 U.S.C. §360bbb-3(b)(4)

205.    As an example, the HHS Secretary issued an EUA for Moderna (86 Fed.Reg. 5200, Jan. 19, 2021), Janssen (86 Fed.Reg. 28608, May 27, 2021), and Pfizer[61] (86 Fed.Reg. 5200, Jan. 19, 2021).

206.    In each EUA, the HHS Secretary establishes the conditions by which persons can participate in the program.

207.    Therefore, an EUA's Scope of Authorization has the force of law during a declared emergency.

208.    The conditions of the EUA are in addition to any applicable requirements under 21 U.S.C. §360bbb-3.

209.    The conditions of the EUA and 21 U.S.C. §360bbb-3 are in addition to requirements under the CDC COVID-19 Vaccination Program Provider Agreement.

210.    The COVID-19 drugs under Defendants' Policy were the property of the federal government.

211.    The federal government created the CDC COVID-19 Vaccination Program to distribute the property to residents of Oregon.

212.    The program required the absolute voluntary participation of all persons,[62] and only persons authorized by the CDC could participate in the administration of the federal property.

213.    President Biden was under a legal obligation to adhere to 21 U.S.C. §360bbb-3, Article VII of the ICCPR Treaty, 45 CFR Part 46, the Belmont Report, 10 U.S.C. § 980, and additional laws and regulations when distributing federal property.

---

[61] See Exhibit B, FDA EUA Letter to Pfizer, August 23, 2021
[62] "Organization must comply with all applicable requirements as set forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine." See 12(a) of Exhibit A, Provider Agreement.

214.    Defendants were not authorized by the U.S. Congress, Oregon legislature, or any other authority to interfere in the administration of the federal government's COVID-19 property.

215.    Congress requires the HHS Secretary to ensure that individuals considering the use of the MCM are informed of their legal rights[63] under the statute (option to accept or refuse).

216.    The State of Oregon became a "Stakeholder"[64] for each EUA product, requiring the State to ensure the conditions established by the HHS Secretary were enforced.

217.    The right to accept exempts the products from 21 U.S.C. § 355(a) during the declared emergency; thus, the individual has the legal authority to use the unlicensed MCM.

218.    Congress specifically conferred the right to refuse upon a person considering participation in a product authorized under the statute because, in 1972, the nation was made aware of human rights atrocities committed against African-American males at the hands of their own government.[65]

219.    In 1973, Senator Edward Kennedy held live hearings in support of passing the National Research Act, exposing medical research abuses by the federal government and pharmaceutical companies, primarily impacting persons of color, women, Indians, and the poor.

220.    In 1974, Congress enacted the National Research Act[66] establishing Institutional Review Boards, the Belmont Report,[67] and the requirement of the HHS Secretary to promulgate

---

[63] 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III)
[64] The Scope of Authorization lists the duties placed upon Stakeholders volunteering to participate in the administration of the 21 U.S.C. §360bbb-3 product.
[65] Tuskegee Study - Timeline - CDC - OS. Published 2023. Accessed November 23, 2023. https://www.cdc.gov/tuskegee/timeline.htm
[66] Title II of the National Research Act - https://www.govinfo.gov/content/pkg/STATUTE-88/pdf/STATUTE-88-Pg342.pdf
[67] The National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research. - Belmont Report. Colorado, DC: U.S. Department of Health and Human Services,1979

regulations governing the protection of humans involved in federally funded investigational medical products known as 45 CFR Part 46 (Common Rule).

221. This led to Congress developing adequate standards of informed consent outlined in detail under 45 CFR § 46.116 and the Belmont Report.[68]

222. The adequate standards of informed consent require the legally effective informed consent[69] of the individual to be prospectively obtained when involving them in federally funded investigational medical products.

223. This form of consent requires the person sponsoring the product[70] or acting on behalf of the sponsor[71] to ensure the individual considering participation is not under a "sanction," "coercion," "undue influence," or "unjustifiable pressure" to participate.[72]

224. Should participants come under those outside pressures, then the person sponsoring the product fails to obtain the individual's legally effective informed consent, even if the individual consents to the use of the product.

225. Therefore, the option to "refuse" has significant Congressional history for the purpose of preventing the U.S. government, pharmaceutical companies, and Defendants from committing additional human rights atrocities.

---

[68] 45 CFR § 46.101(c) & 45 CFR § 46.101(i) require any federally funded research activity to come under the purview of the Belmont Report.

[69] 45 CFR 46.116(a)(1); See also, Doc 8, Footnote 31, ¶ 72, 73, 74,

[70] The federal government purchased all COVID-19 EUA drugs and became their sponsor.

[71] Kaiser was acting on behalf of the federal and state government when requiring Plaintiffs to inject the federal property into their bodies as a condition to continue employment.

[72] The Belmont Report's definition of "adequate standards" of informed consent. See Part C: Applications 1. Informed Consent. https://www.hhs.gov/ohrp/sites/default/files/the-belmont-report-508c_FINAL.pdf

226.    The right to refuse the unlicensed use of federally owned MCMs ensured that the executive branch and persons under its authority complied with the laws pertaining to the investigational use of unlicensed MCMs.[73]

227.    The lawful right of the individual to "consider" the use of the unlicensed MCM is a right conferred upon the individual in clear and unambiguous language by a valid act of Congress.[74]

228.    No government, public officer, private employer, Defendants, or any other person of authority may interfere in the individual's autonomous choice, whether that choice is to accept or to refuse the use of the MCM.

229.    The choice of whether to use or not use an MCM belongs exclusively to the individual and not to a third party agreeing or disagreeing with that choice.

230.    21 U.S.C. §360bbb-3 is a pervasive federal scheme to introduce MCMs into commerce only under a declared emergency.

231.    The Supremacy Clause Doctrine dictates that no person has lawful authority to establish, enforce, or continue in effect with a law, rule, regulation, ordinance, or any other legal means that interferes with or amends the MCM's expanded access protocol as established by the HHS Secretary and Congress.[75]

---

[73] 45 CFR Part 46, the Belmont Report, Article VII of the ICCPR Treaty, Federal Wide Assurance program, CDC COVID-19 Vaccination Program Provider Agreement, among others.

[74] 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III)

[75] "FDA states that the terms and conditions of an EUA issued under section 564 preempt state or local law, both legislative requirements and common-law duties, that impose different or additional requirements on the medical product for which the EUA was issued in the context of the emergency declared under section 564." - Emergency Use Authorization of Medical Products and Related Authorities," Section VII. U.S. Food and Drug Administration. Published 2022. Accessed June 6, 2023.
 https://www.fda.gov/regulatory-information/search-fda-guidance-documents/emergency-use-authorization-medical-products-and-related-authorities#preemption

232.    Such interference poses an obstacle to accomplishing federal goals for the unlicensed use of the MCMs.

233.    The defendants' vaccine mandate interferes with the federal goals of administering its property during the declared emergency, and it is impossible to reconcile with federal law.

234.    Public and private employers may not use a state's at-will employment law or any other common law as the means to interfere in Plaintiffs' lawful authority to exercise their 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) option.

235.    The use of that law to interfere with Plaintiffs' autonomous choice is impossible to reconcile with federal law.[76]

236.    Congress does not intend to displace a state's at-will employment doctrine in all areas of law. However, when the MCM scheme is viewed under the field preemption test, it is clear that Congress preempts the use of the State's at-will employment law when it is used solely to interfere in the administration of the MCM.

237.    **Congress completely preempts a state, or political subdivision of a state, or any other legal authority from establishing, enforcing, or continuing in effect, with respect to a MCM under 21 U.S.C. §360bbb-3, any provision of law that is different from, or is in conflict with, any requirement applicable under the statute or the Scope of Authorization issued by the HHS Secretary.**

238.    Congress empowers the HHS Secretary to establish the conditions by which persons participate in activities under 21 U.S.C. § 360bbb-3.

---

[76] *Arizona v. United States*, 567 U.S. 387, 399 (2012) ("[Congress's] intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'") (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

239.    However, Congress was explicit that "Nothing in this section provides the Secretary any authority to require any person to carry out any activity that becomes lawful pursuant to an authorization under this section."[77]

240.    In other words, the HHS Secretary has lawful authority to grant expanded access protocols for a MCM.

241.    Still, Congress prohibits the Secretary from requiring any person to manufacture, distribute, store, administer, inject, wear, test, or otherwise use the product.

242.    Defendants' Policy, relying on an EUA/EUI MCMs for compliance, was arbitrary and capricious because Congress expressly prohibits persons from manufacturing, distributing, administering, or using the MCM under involuntary conditions.

243.    Healthcare workers are not legally obligated to administer MCMs to Plaintiffs, nor can Defendants require healthcare workers to perform that function.

244.    Moreover, Plaintiffs are not required to use any product authorized under the section of the law, nor can Defendants require Plaintiffs to use them as a condition of anything.

245.    Defendants do not claim to be President Biden, the CDC, or the HHS Secretary, nor did they state by what authority they could require that which Congress prohibited (i.e., involuntary participation).

246.    Therefore, when Defendants enacted its COVID-19 Vaccine Policy relying exclusively on EUA COVID-19 drugs for compliance, they fraudulently usurped the authority of Congress, the HHS Secretary, the CDC, and Plaintiffs by amending the conditions established under 21 U.S.C. §360bbb-3.

---

[77] 21 U.S.C. §360bbb-3(l)

247.    Defendants had no lawful power to insert themselves into a position of authority delegated only to the United States HHS Secretary.

248.    Defendants had no authority to amend the legal scheme by which persons access the federal government's COVID-19 property.

249.    Defendants had no authority to require of Plaintiffs that which the U.S. Congress prohibits (i.e., mandatory participation).

250.    Defendants lacked authority to use the state's at-will employment law to terminate Plaintiffs for exercising their lawful authority to refuse the injection of federally funded investigational drugs and biologics under EUA or EUI.

251.    Defendants misrepresented and extended their authority under fraudulent conditions when establishing employment conditions upon Plaintiffs injecting the federal government's COVID-19 property into their bodies.  Moreover, their actions violate the federal rights of Plaintiffs to choose their 21 U.S.C. §360bbb-3 option free from outside pressure.

252.    Defendants applying punitive actions (e.g., wearing an investigational mask, taking an investigational test, segregation, termination from employment) to Plaintiffs choosing the 21 U.S.C. §360bbb-3 option to refuse violated Plaintiffs Fourteenth Amendment equal protection rights because the Policy, as applied, treated the option to refuse differently from the option to accept.

253.    Defendants applying punitive actions to Plaintiffs choosing the 21 U.S.C. §360bbb-3 option to refuse violated Plaintiffs Fourteenth Amendment due process rights because the Policy, as applied, stripped Plaintiffs of their interest in a legal right conferred upon them by a valid act of Congress without a hearing before an impartial body.

254.    Defendants' Policy, as applied to the exclusive use of federally owned EUA drugs, lacked the force of law and, thus, was *ultra vires*.

255.    Therefore, Defendants' Policy requiring Plaintiffs' compulsory use of EUAs, as applied, was a misrepresentation of their authority, an act of fraud, unlawful, *ultra vires*, capricious, arbitrary, and immoral.

**C.    Emergency Use Instruction (EUI)**

256.    The CDC has claimed the authority to grant expanded access protocols it cites as Emergency Use Instructions for the unlicensed use of products. However, no such authority exists in federal law.

257.    The CDC claims that "The CDC Director has legal authority to create, issue, and disseminate EUI for FDA-approved medical products. EUI inform healthcare providers and recipients about such products' approved, licensed, or cleared conditions of use under circumstances that go beyond the scope of the approved labeling (package insert)."[78]

258.    There are several issued EUIs for COVID-19 drugs that the public is unaware of.

259.    Until courts rule otherwise, authorities will continue to enact mandatory policies relying on licensed drugs authorized by the CDC for unlicensed use.

260.    Because the CDC is issuing EUIs under the 21 U.S.C. §360bbb-3 authority of the HHS Secretary, they operate under the same treaties, laws, federal agreements, and federal contracts as EUAs.

---

[78] Questions and Answers about Emergency Use Instructions (EUI) below Are Answers to Frequently Asked Questions about Emergency Use Instructions (EUI). Refer to EUI for Pfizer-BioNTech COVID-19 Vaccine and Moderna COVID-19 Vaccine for Additional Doses. Accessed November 12, 2023.
https://www.cdc.gov/vaccines/covid-19/eui/downloads/EUI-FAQ.pdf

261.    Therefore, Defendants' reliance on EUIs for compliance with its Policy was *ultra vires*, unlawful, capricious, and immoral because federal law restricts persons from coming under the compulsory requirement to participate in the investigational use of an EUI.

**D**.    **The PREP Act**

262.    In 2005, Congress passed the Public Readiness and Emergency Preparedness Act, hereafter referred to as the PREP Act, [79] to provide immunities for persons volunteering for "covered" activities.

263.    In accordance therewith, the HHS Secretary issued a PREP Act declaration for Medical Countermeasures against COVID-19 in February 2020.[80]

264.    As a matter of law, all COVID-19 drugs, influenza vaccines, masks, and diagnostic testing articles under Defendants' Policy's requirements were declared a countermeasure under the PREP Act.[81]

265.    The PREP Act, fundamentally, is an immunity statute.

266.    Due to the near absolute immunities provided by the U.S. Congress for persons involved in the various activities of "covered countermeasures," the statute establishes restrictions, obligations, and duties for persons and governments involved in those activities.

267.    Congress expressly crafted language preempting state and local law conflicting with the PREP Act,[82] which provides, in pertinent part:

> (8) Preemption of State law
>
> During the effective period of a declaration under subsection (b)…no State or political subdivision of a State may establish,

---

[79] 42 USC 247d-6d & 42 USC 247d-6e
[80] 85 FR 15198
[81] See Amendments I-XI of 85 FR 15198
[82] 42 U.S.C. § 247d-6d(b)(8)

enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that—

(A) is different from, or is in conflict with, any requirement applicable under this section; and

(B) relates to the…administration…of the covered countermeasure, **or to any matter included in a requirement applicable to the covered countermeasure** under this section or any other provision of this chapter, **or under the Federal Food, Drug, and Cosmetic Act**.[83] [emphasis added].

268.   Moreover, Congress informed legal authorities that:

(c) Voluntary program

The Secretary shall ensure that a State, local, or Department of Health and Human Services plan to administer or use a covered countermeasure is consistent with any declaration under 247d–6d of this title…and that potential participants are educated with respect to contraindications, **the voluntary nature of the program**, and the availability of potential benefits and compensation under this part. [Emphasis added.][84]

269.   The "voluntary nature" of the "program" consists of "covered countermeasures,"[85] "covered persons,"[86] "covered individuals,"[87] and "qualified persons."[88]

270.   Therefore, as a general rule, no person may utilize any lawful authority to "establish," "enforce," or "continue in effect with" "any provision of law or legal requirement" that otherwise conflicts or interferes with the "voluntary nature" of the program by establishing involuntary conditions such as Defendants' Policy.

271.   Moreover, no person may utilize any lawful authority to "establish," "enforce," or "continue in effect with" "any provision of law or legal requirement" that interferes with "any

---

[83] 21 U.S.C. § 301 et. seq.
[84] 42 U.S.C. § 247d-6e(c)
[85] 42 USC § 247d-6d(i)(1)
[86] 42 USC § 247d-6d(i)(2)
[87] 42 USC 247d-6d(a)(3)(C)(i,ii)
[88] 42 USC § 247d-6d(i)(8)

matter" relating to any "requirement applicable to the covered countermeasure" under 21 U.S.C. §360bbb-3 which includes a person's authority to accept or refuse the MCM without consequence.[89]

272. **As a matter of law, Congress completely preempts a state, or political subdivision of a state, or any other legal authority from establishing, enforcing, or continuing in effect with respect to a countermeasure under the PREP Act, any provision of law that is different from or is in conflict with, any requirement applicable under the statute or the declared emergency and its amendments as published in the Federal Register.**

273. Therefore, Defendants were expressly preempted from using its position of influence and authority for the sole purpose of interfering with Plaintiffs' authority to determine participation in a PREP Act "covered countermeasure" (e.g., drugs, masks, testing articles).

274. The Policy, as applied, required Plaintiffs to inject or otherwise use a PREP Act countermeasure as a condition to enjoy a benefit to which they were otherwise entitled (e.g., employment, freedom from the use of unwanted investigational testing and masks).

275. When Plaintiffs refused to surrender their statutory authority to refuse the countermeasure's administration, Defendants, acting with moral turpitude, informed Plaintiffs that they would lose employment and benefits and their liberties (e.g., freedom from wearing investigational masks or using experimental testing articles).

276. Defendants terminated Plaintiffs' employment using Oregon's preempted at-will employment laws as the means to retaliate against Plaintiffs exercising their statutory rights under

---

[89] 42 U.S.C. § 247d-6d(b)(8)(b) states to any matter or requirement applicable to a countermeasure under the FDCA. 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) is under the FDCA.

21 U.S.C. §360bbb-3 to refuse the administration of an EUA/EUI product and for refusing to participate in a covered countermeasure under the PREP Act voluntarily.

277.    The use of the State's at-will employment law for the sole purpose of causing emotional and economic damages to Plaintiffs exercising a legal right was unlawful.

278.    Therefore, Defendants' Policy requiring Plaintiffs' compulsory use of countermeasures, as applied, was a misrepresentation of their authority, an act of fraud, unlawful, *ultra vires*, capricious, arbitrary, and immoral.

279.    Defendants' use of Oregon's laws (e.g., at-will employment laws) as one of the means to apply punitive measures against Plaintiffs refusing the injection of the COVID-19 federal property was *ultra vires* and, therefore, lacked the force of law.

280.    Therefore, Defendants damaged Plaintiffs under fraudulent conditions, acting "as if" they had the authority to:

> (1) establish expanded access protocols for EUA products,
>
> (2) establish involuntary participation conditions for products and activities only under the PREP Act,
>
> (3) use the at-will employment laws to punish Plaintiffs for refusing injection of the COVID-19 federal property,
>
> (4) use the force of their authority to prevent Plaintiff's enjoyment of a federally funded program.

E.        **Federal Wide Assurance Agreement**

281.    Defendants assured the HHS that they would comply with the Belmont Report and 45 CFR Part 46 through its FWA00002344 number anytime they involved a human with a federally funded medical research activity[90] as a condition to access federal funding.

282.    Upon information and belief, Kaiser received federal funding related to the COVID-19 pandemic.

283.    Defendants were aware of, or should have been aware, that at no time were they allowed to place an individual under a "sanction," "coercion," "undue influence," or "unjustifiable pressures" to participate in federally funded research activities such as the CDC COVID-19 Vaccination Program.

284.    Although Defendants might not have administered the drugs to all persons under its Policy, it established conditions requiring Plaintiffs to participate in a federally funded research activity in violation of its FWA.

285.    The FWA holds third-party benefits for Plaintiffs, specifically under 45 CFR § 46.116.  For each duty placed upon Defendants, a corresponding right exists for Plaintiffs.

286.    As an example, 45 CFR 46.116(a)(1) informs Defendants that "Before involving a human subject in research covered by this policy, an investigator shall obtain the legally effective informed consent of the subject or the subject's legally authorized representative." Therefore, the duty upon Defendants is to obtain legal consent establishing the right of Plaintiffs to give it.

---

[90] The CDC COVID-19 Vaccination Program requires Oregon and authorized providers to conduct joint research activities involving humans with the federally funded COVID-19 EUA drugs. Monitoring and reporting of adverse events are required under 21 U.S.C. §360bbb-3, the CDC COVID-19 Vaccination Program Provider Agreement, and the Scope of Authorization for each EUA drug. Moreover, it isn't only persons signing the CDC COVID-19 Vaccination Program but persons also acting as "stakeholders" under the Scope of Authorization for each EUA drug.

287.    Defendants are well aware, or should be aware, through its existing Institutional Review Boards, decades-long use of protocols under 21 U.S.C. §360bbb *et. seq*., FWA, and signed CDC COVID-19 Vaccination Program Provider Agreement, they must obtain Plaintiffs legally effective informed consent before involving them in a federally funded research activity.

288.    The FWA, Belmont Report, and 45 CFR Part 46 exist exclusively to prevent medical research abuses such as Defendants' Policy denying Plaintiffs' authority to give their legally effective informed consent.

289.    Defendants assured the federal government that they would effectively perform the duties owed to Plaintiffs at all times whenever they involved Plaintiffs in a federally funded research program, and Defendants violated those duties when requiring involuntary participation in the CDC COVID-19 Vaccination Program.

290.    Therefore, Defendants' Policy requiring Plaintiffs' compulsory participation in a federally funded research activity was a misrepresentation of their authority, an act of fraud, unlawful, *ultra vires*, capricious, arbitrary, and immoral.

F.    **State Action**

291.    42 U.S.C. § 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

292.    It is well-established U.S. Supreme Court precedent that a federal statute conferring a right onto an individual in unambiguous language is enforceable under 42 U.S.C. § 1983.[91]

293.    The United States Supreme Court and the Ninth Circuit Court of Appeals utilize several tests when ascertaining if a private party is acting under a State Policy engaged in State Action.

294.    The State of Oregon voluntarily entered into an agreement with the CDC to administer the federal government's COVID-19 investigational new drugs through its existing immunization program.

295.    On August 25, 2021, OHA issued PH 38-2021 Temporary Administrative Rule, which states, "On or before October 18, 2021, healthcare providers and healthcare staff must provide their employer, contractor, or responsible party with either: Proof of vaccination showing they are fully vaccinated; or Documentation of a medical or religious exception."

296.    Therefore, Kaiser was acting under a State Policy meeting the requirements of the State Compulsion Test held by the U.S. Supreme Court and Ninth Circuit Court of Appeals.

297.    However, there are other tests the courts utilize to determine when a private party is engaged in state action.

298.    Kaiser was involved in joint action with the State to such a degree that they were also in a symbiotic relationship.

299.    The State authorized Kaiser to help it distribute the federal COVID-19 property under the terms and conditions established by the executive branch of the federal government.

---

[91] *Maine v. Thiboutot*, 448 U.S. 1 (1980), the court held that "Even were the language ambiguous, however, any doubt as to its meaning has been resolved by our several cases suggesting, explicitly or implicitly, that the §1983 remedy broadly encompasses violations of federal statutory as well as constitutional law." See also, *Health and Hospital Corporation of Marion Cty. V. Talevski*, 599 U.S. ____ (2023).

300.    That relationship was bound to comply with the CDC COVID-19 Vaccination Program Provider Agreement.

301.    The CDC informed Defendants via its COVID-19 Vaccination Program Provider Agreement that:

1.    Organization must administer COVID-19 Vaccine in accordance with all requirements and recommendations of CDC and CDC's Advisory Committee on Immunization Practices (ACIP).

2.    Within 24 hours of administering a dose of COVID-19 Vaccine and adjuvant (if applicable), Organization must record in the vaccine recipient's record and report required information to the relevant state, local, or territorial public health authority.

3.    Organization must submit Vaccine-Administration Data through either (1) the immunization information system (IIS) of the state and local or territorial jurisdiction or (2) another system designated by CDC according to CDC documentation and data requirements.

4.    Organization must not sell or seek reimbursement for COVID-19 Vaccine and any adjuvant, syringes, needles, or other constituent products and ancillary supplies that the federal government provides without cost to Organization.

5.    Organization must administer COVID-19 Vaccine regardless of the vaccine recipient's ability to pay COVID-19 Vaccine administration fees.

6.    Before administering COVID-19 Vaccine, Organization must provide an approved Emergency Use Authorization (EUA) fact sheet or vaccine information statement (VIS), as required, to each vaccine recipient, the adult caregiver accompanying the recipient, or other legal representative.

7.    Organization's COVID-19 vaccination services must be conducted in compliance with CDC's Guidance for Immunization Services During the COVID-19 Pandemic for safe delivery of vaccines.

8.    Organization must comply with CDC requirements for COVID-19 Vaccine management.

9.    Organization must report moderate and severe adverse events following vaccination to the Vaccine Adverse Event Reporting System (VAERS)

10.    Organization must provide a completed COVID-19 vaccination record card to every COVID-19 Vaccine recipient, the adult caregiver accompanying the recipient, or other legal representative. Each COVID-19 Vaccine shipment will include COVID-19 vaccination record cards.

11.    Organization must comply with all applicable requirements as set forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine.

12.    Organization must administer COVID-19 Vaccine in compliance with all applicable state and territorial vaccination laws.

302.    Although the agreement is a contract between Kaiser and the CDC, the contract was a required condition by the State as a condition for Defendants to participate in the CDC COVID-19 Vaccination Program.

303.    Moreover, the contract stipulates that Defendant "must comply with all applicable requirements as set forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine." This includes the required research activities previously discussed as established under the Scope of Authorization for each COVID-19 EUA drug.

304.    As a matter of law, from the time a person walks into the doors of a State-authorized private party for the sole purpose of receiving the administration of the federal government's COVID-19 vaccine until the time they leave, the private party is wholly acting under color of law on behalf of the State government.

305.    The private party gives complete deference to the State and CDC regarding how the private party orders, receives, stores, administers, reports, monitors, and bills for the injections.

306.    Moreover, the federal government informed Defendants that "[a]t this time, **all COVID-19 vaccine in the United States has been purchased by the U.S. government** (USG)

COMPLAINT                                    66

for administration exclusively by providers enrolled in the CDC COVID-19 Vaccination Program and remains U.S. government property until administered to the recipient." (Emphasis added).

307. Defendants were completely under the complete control, authority, and directive of the State, which volunteered to administer the federal government's property.

308. Moreover, the federal government warned Defendants that "Other possession, distribution, delivery, administration, shipment receipt, or use of COVID-19 vaccine **outside the parameters of the Program** constitutes, at a minimum, theft under 18 U.S.C. § 641, and violation of other federal civil and criminal laws." (Emphasis added).

309. When Defendants issued its Policy requiring the mandatory injection of the federal government's property, they used the "COVID-19 vaccine outside the parameters of the Program," demonstrating that Defendants misrepresented their authority.

310. Because the drugs were not only under EUA authorization but also under a federally funded program. The CDC was bound to comply with 45 CFR § 46.122 and 10 U.S.C. § 980, requiring individuals to give their legally effective informed consent in advance of the product's administration.

311. As previously discussed, legally effective informed consent requires an individual to give their free consent under conditions free of outside pressures. Sanctions or other punitive actions applied to an individual refusing to participate in the federally funded IND nullify that consent.

312. The State was under a legal obligation to obtain Plaintiffs' legally effective informed consent in accordance with the equal protection of laws and due process as guaranteed to them under the Fourteenth Amendment.

313. The state delegated that function to Defendants via its requirement of the Defendant to sign the CDC Contract whereby Defendants pledged to "comply with all applicable requirements as set forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine."

314. The State could not delegate the public function of administering the federal government's COVID-19 EUA property without also delegating its legal and Constitutional obligations. Therefore, Defendants, acting on behalf of the State, owed statutory duties under 21 U.S.C. §360bbb-3, 10 U.S.C. § 980, PREP Act, 45 CFR Part 46, the Belmont Report, and the CDC COVID-19 Vaccination Program Provider Agreement and Fourteenth Amendment Constitutional duties to Plaintiffs when establishing mandatory conditions of their involvement in the federally funded INDs.

### G.   State Action Tests

315. **The public function test** is met by (1) Kaiser exercising powers exclusively held by the federal government and Oregon[92], (2) the power is part of Oregon State's prerogative[93] (the State did not have to volunteer to participate, and Defendants operate exclusively under the State's authority), and (3) the power is such that the State itself is obligated to perform due to Governor Brown voluntarily agreeing the State of Oregon to perform for the CDC.[94]

316. The U.S. Supreme Court held in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974), "We have, of course, found state action present in the exercise by a private entity of powers traditionally exclusively reserved to the State."

---

[92] *Jackson v. Metropolitan Edison Co.*, 419 U.S. at 352
[93] *Flagg Bros., Inc. v. Brooks*, 436 U.S. at 160. See also *Jackson v. Metropolitan Edison Co.*, 419 U.S. at 353
[94] *Jackson v. Metropolitan Edison Co.*, 419 U.S. at 353

317     **The state compulsion test** is met by the State issuing a mandate impacting Plaintiffs' employment. Kaiser is a state actor under this test pursuant to *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 166 (1978); *Jackson*, 419 U.S. at 357; *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 170 (1970); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 173 (1965)).

318.    **The symbiotic relationship test**[95] is met because:

(1)  Oregon was required to obtain Plaintiffs' legally effective informed consent, and they relied upon the Defendants for that function;

(2)  Oregon owed Fourteenth Amendment obligations to Plaintiffs who were delegated to Defendants[96];

(3)  Oregon and Defendants were required to conduct ongoing research activities on behalf of the federal government;

(4)  Oregon did not give deference to Defendants on how they could conduct the activities of the COVID-19 Vaccination Program and required much of them as previously discussed[97];

---

[95] *Brunette v. Humane Society of Ventura County*, 294 F.3d 1205 (9th Cir. 2002): "*Burton* (*Burton v. Wilmington Pkg. Auth*, 365 U.S. 715, 81 S. Ct. 856 (1961)) teaches that substantial coordination and integration between the private entity and the government are the essence of a symbiotic relationship. Often significant financial integration indicates a symbiotic relationship. *See Rendell-Baker v Kohn*, 457 U.S. at 842-43, 102 S.Ct. 2764; *Vincent v. Trend W. Tech. Corp*., 828 F.2d 563, 569 (9th Cir. 1987). For example, if a private entity, like the restaurant in *Burton*, confers significant financial benefits indispensable to the government's "financial success," then a symbiotic relationship may exist. *Vincent*, 828 F.2d at 569. A symbiotic relationship may also arise by virtue of the government's exercise of plenary control over the private party's actions. *See Dobyns v. E-Systems, Inc*., 667 F.2d 1219, 1226-27 (5th Cir. 1982) (finding symbiotic relationship where the government-controlled a private peacekeeping force engaged in a government-directed field mission in the Sinai Peninsula).

[96] In *Giron v. Corrections Corp. of America*, 14 F. Supp. 2d 1245 (D.N.M. 1998), the court stated, "If a state government must satisfy certain constitutional obligations when carrying out its functions, it cannot avoid those obligations and deprive individuals of their constitutionally protected rights by delegating governmental functions to the private sector. *See Terry v. Adams*, 345 U.S. 461, 73 S. Ct. 809, 97 L. Ed. 1152 (1953). The delegation of the function must carry with it a delegation of constitutional responsibilities."

[97] As the court held in *Modaber v. Culpeper Memorial Hospital, Inc*., 674 F.2d 1023 (4tCir. 1982): "we must inquire 'whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity that the action of the latter may fairly be treated as that of the State itself." *Jackson v. Metropolitan Edison Co*., 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974); *accord, Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 157, 98 S.Ct. 1729, 1733, 56 L.Ed.2d

(5)  Oregon relied upon private parties to achieve its goal of administering the federal government's COVID-19 property.

319.    The Supreme Court held that "to act 'under color of' state law for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting "under color" of law for purposes of § 1983 actions."[98]

320.    The State's COVID-19 emergency medical countermeasure program is so intimately regulated, licensed, and funded that "The State has so far insinuated itself into a position of interdependence…that it must be recognized as a joint participant in the challenged activity" *Burton v. Wilmington Pkg. Auth*, 365 U.S. 715, 81 S. Ct. 856 (1961).

321.    **The customs test.** The Supreme Court noted in *Adickes v. S. H. Kress & Co*., 398 U.S. 144 (1970) that the "Petitioner will have established a claim under §1983 for violation of her equal protection rights if she proves that she was refused service by respondent because of a <u>state-enforced custom…</u>" (emphasis added).

322.    All without fear of consequence from the State, Kaiser PolicyMakers:

(1) assured the federal government they would never place an individual under outside pressures to participate in a federally funded research activity via their FWA agreement but did so via their Policy,

---

185 (1978). In holding that a privately-owned utility's termination of service is not "state action", the Court in *Jackson* makes it clear that state involvement without state responsibility cannot establish this nexus. See 419 U.S. 358, 95 S.Ct. 457. A state becomes responsible for a private party's act if the private party acts (1) in an exclusively state capacity, (2) for the state's direct benefit, or (3) at the state's specific behest. It acts in an exclusively state capacity when it "exercises powers traditionally exclusively reserved to the state[,]" 419 U.S. 352, 95 S.Ct. 454; for the state's direct benefit when it shares the rewards and responsibilities of a private venture with the state, see id., 357-58, 95 S.Ct. 456-57, *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 723-24, 81 S.Ct. 856, 860-61, 6 L.Ed.2d 45 (1961); and at the state's specific behest when it does a particular act which the state has directed or encouraged."
[98] *Dennis v. Sparks*, 449 U.S. 24 (1980)

(2) signed the CDC COVID-19 Vaccination Program Provider Agreement promising to ensure Plaintiffs were given the option to accept or refuse, but removed that option via their Policy,

(3) was required to obtain Plaintiffs' legally effective informed consent, but wilfully ignored that duty,

(4) is assigned an Institutional Review Board requiring them never to place Plaintiffs under involuntary conditions when involved in INDs, but required compulsory participation under threat of penalty,

(5) has no authority to amend the Scope of Authorization for each COVID-19 EUA drug, but amended the conditions by which the Scope of Authorization is lawful,

(6) has no authority to establish conditions contrary to the CDC regarding its administration of the federally owned property, but ignored its duties under 12(a) of the Provider Agreement,

(7) has no authority to establish conditions contrary to applicable requirements of any drug under an EUA/EUI, but ignored those applicable requirements,

(8) is restricted by the U.S. Congress from using any laws of the State or political subdivision of the State to interfere in the federal government's property by terminating Plaintiffs employment exercising a federally secured right to refuse participation in the product's administration, but used the State's at-will laws and the State custom to retaliate against Plaintiffs' choice of their federally secured option.

323.    Kaiser PolicyMakers accomplished its deprivation of rights by acting on a State-enforced custom having the force of law outside of any lawful authority.

324.    Governor Brown, Attorney General Ellen Rosenblum, and Kaiser PolicyMakers established and enforced a state custom whereby a person's EUA and PREP Act statutory rights could be ignored "as if" they did not exist.

325.    Plaintiffs were refused employment for violating a state-enforced custom, not federal or state law.

COMPLAINT                                71

326.    Federal law prohibits the unlicensed use of drugs, biologics, and devices outside the prescribed conditions as established by a valid act of Congress.

327.    The State was under no legal obligation to participate in the distribution of the federal government's COVID-19 property, nor was it required to use its existing immunization program for that purpose.[99]

328.    The CDC chose to use a state's existing immunization program so that President Biden could comply with his duties under 45 CFR Part 46, the Belmont Report, Article VII of the ICCPR Treaty, 21 U.S.C. §360bbb-3, and the Scope of Authorization for each EUA because the State already had a FWA agreement on file with the federal government.

329.    The State owed constitutional obligations[100] to Plaintiffs and had full authority to train and educate medical facilities and healthcare workers it licensed of those obligations. Moreover, it had the same authority to enforce the laws, regulations, and contractual agreements it was under when involving citizens with the federal COVID-19 drug property.

330.    Rather, the State refused to educate its licensed medical facilities and healthcare workers about the laws and rights afforded to Plaintiffs under the EUA and PREP Act statutes.

331.    The State not only refused to protect Plaintiffs' rights, but it also established and enforced a custom that was illegal and in direct violation of federal law and the Fourteenth Amendment.

332.    Governor Brown and Oregon Health Authority Patrick Allen conspired to establish a State Custom having the force of law replacing federal law and contractual agreements, and in defiance of the Fourteenth Amendment's equal protection and due process guarantees.

---

[99] "This program is a part of collaboration under the relevant state, local, or territorial immunization's cooperative agreement with CDC." See Exhibit A, Provider Agreement.
[100] The Fourteenth Amendment's Equal Protection of Laws and Due Process

333.    Kaiser Policymakers acted on this State-encouraged and enforced custom when engaging in their unlawful conduct, which led to the deprivation of Plaintiffs' statutory and Constitutional rights.

334.    The State punished Plaintiffs who exercised their statutory authorities while enabling Kasier PolicyMakers to engage in unlawful conduct unabated.

335.    As a matter of law, Defendants could only establish a COVID-19 Vaccination Policy because the State agreed to administer the federal COVID-19 property in which it authorized Defendants to participate.  Therefore, the State and Defendants both conspired under a state custom to deprive Plaintiffs of their Constitutional and statutory rights and privileges because the State and Defendants were clothed with the authority of State Power.[101]

336.    "If a private actor is functioning as the government, that private actor becomes the state for purposes of state action."[102]  Defendants established mandatory conditions to participate in the State's COVID-19 Vaccination Program that was clothed with the power of a state-enforced custom.

337.    The State established a custom of depriving Plaintiffs of their Fourteenth Amendment rights to due process and equal protection of law.

338.    Defendants acted upon that custom when violating federal law, its contractural obligations holding third-party benefits for Plaintiffs, and its duties as a state actor to ensure Plaintiffs' Fourteenth Amendment rights were protected at all times pertinent when establishing a

---

[101] Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken "under color of" state law. *United States v. Classic*, 313 U.S. 299 (1941), *citing Ex Parte Virginia*, 100 U. S. 339, 100 U. S. 346; *Home Telephone & Telegraph Co. v. Los Angeles*, 227 U. S. 278, 227 U. S. 287, *et seq.*; *Hague v. CIO*, 307 U. S. 496, 307 U. S. 507, 307 U. S. 519; cf. 101 F.2d 774, 790.
[102] *Terry v. Adams*, 345 U.S. 461, 469-70, 73 S. Ct. 809, 97 L. Ed. 1152 (1953); *See Jackson v. Metropolitan Edison Co.*, 419 U.S. at 353, 95 S. Ct. 449.

COVID-19 Policy requiring involuntary participation in the administration of the federal COVID-19 property under 21 U.S.C. §360bbb-3 authorization and PREP Act statute.

339.    Therefore, Defendants' Policy requiring Plaintiffs' compulsory use of the federal property was a misrepresentation of their authority, an act of fraud, unlawful, *ultra vires*, capricious, arbitrary, and immoral.

## H.    FOURTEENTH AMENDMENT EQUAL PROTECTION OF LAWS

340.    The Fourteenth Amendment to the U.S. Constitution guarantees equal protection of the laws.

341.    It is a well-established U.S. Supreme Court precedent that a federal statute conferring a right onto an individual in unambiguous language is enforceable under 42 U.S.C. § 1983.[103]

342.    21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) contains a required condition of the Secretary "to ensure that individuals to whom the product is administered are informed — 'of the option to accept or refuse administration of the product.'"

343.    Therefore, the statute conferred a legal right onto Plaintiffs to accept or refuse any product authorized under 21 U.S.C. §360bbb-3. The "option" is a federally secured right established by a valid act of Congress.

344.    Defendants owed a Constitutional duty to treat Plaintiffs equally before the law, irrespective of their chosen statutory option. That Constitutional duty required Defendants to

---

[103] *Maine v. Thiboutot*, 448 U.S. 1 (1980), the court held that "Even were the language ambiguous, however, any doubt as to its meaning has been resolved by our several cases suggesting, explicitly or implicitly, that the §1983 remedy broadly encompasses violations of federal statutory as well as constitutional law." See also, *Health and Hospital Corporation of Marion Cty. V. Talevski,* 599 U.S. ____ (2023).

ensure Plaintiffs were free from outside pressures when considering either option and, once the option was chosen, to treat Plaintiffs equally, irrespective of the option chosen.

345.    As a matter of law, Defendants are not allowed to treat persons choosing the option to accept differently than persons choosing the option to refuse under 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III).

346.    The statute does not afford Defendants the legal authority to establish positive or negative benefits based on an individual's 21 U.S.C. §360bbb-3 chosen option.  Such conditions violate the Equal Protection doctrine guaranteed to Plaintiffs under the Fourteenth Amendment and legally effective informed consent requirements.

347.    Defendants' Policy prospectively applied punitive actions only to persons (Plaintiffs) exercising the federally secured option to refuse under 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) and the PREP Act in violation of Plaintiffs' Fourteenth Amendment rights.

348.    The requirement to wear a mask under the PREP Act if a medical or religious exemption was granted violated the equal protection doctrine by penalizing persons choosing the option to refuse.

349.    The requirement to be segregated from other coworkers if an exemption was granted violated the equal protection doctrine by requiring only those employees who chose the option to refuse to segregate.

350.    The requirement to engage in unwanted investigational testing articles if an exemption was granted violated the equal protection doctrine by requiring only those employees who chose the option to refuse to test.

351.    Defendants' Policy and actions taken under its authority were *ultra vires* because it required hospital staff to treat Plaintiffs differently solely on their 21 U.S.C. §360bbb-

3(e)(1)(A)(ii)(III) option and PREP Act choice of participation, in violation of the Fourteenth Amendment's equal protection guarantees.

## I.    FOURTEENTH AMENDMENT DUE PROCESS

352.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution guarantees the right to due process of law before infringing a citizen's interest in life, liberty, or property.

353.    21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) contains a required condition of the Secretary "to ensure that individuals to whom the product is administered are informed — 'of the option to accept or refuse administration of the product.'"

354.    The option applies to any product authorized under the statute, which includes COVID-19 testing articles, masks, and other drugs, biologics, and devices.

355.    The PREP Act requires only voluntary participation.

356.    Defendants' Policy stripped Plaintiffs of their legal right to choose the 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) option to refuse without consequence and subjected them to involuntary participation in a PREP Act countermeasure without a hearing.

357.    If there is a consequence to a person exercising a specific right conferred upon them by a valid act of Congress, then the "right" is not a right.

358.    Defendants violated Plaintiffs' substantive due process rights when enacting and enforcing its Policy because (1) it stripped defendants of their federally secured legal right to refuse without consequence, (2) it required Plaintiffs to seek an exemption as the means to enjoy their legal right, (3) it required Plaintiffs to prospectively surrender their substantive due process rights under threat of penalty to seek judicial relief should they incur injury from the drug or its

COMPLAINT                                      76

administration due to the drug being under PREP Act immunity as the means to continue employment.

359.    The PREP Act strips an individual of their due process rights to seek judicial relief should injury occur from the use of a product under the statute's authority, but only after the person legally and effectively consents[104] to the use of the product (i.e., free from outside pressures). This reason is why the "program" is under "voluntary conditions."

360.    Defendants cannot compel Plaintiffs, under threat of penalty, to surrender their due process rights.

361.    Such a requirement is a hostile attack on the fundamental principles upon which the federal Constitution is founded.

362.    At all times pertinent, Defendants refused to acknowledge Plaintiffs' statutory authority to refuse drugs and biologics under 21 U.S.C. §360bbb-3 authorization and PREP Act countermeasures without consequence.

363.    Therefore, irrespective of any procedure to allow Plaintiffs a date, time, and place to air their complaint, their rights were never adjudicated impartially.[105]

364.    Defendants violated the procedural due process rights of Plaintiffs by refusing to acknowledge their statutory authority to refuse the EUA/PREP Act products without incurring a penalty or losing a benefit to which they were otherwise entitled before denying them the right to continue enjoying a benefit to which they were otherwise entitled.

---

[104] Investigational uses of products funded or under federal authority must comply with 45 CFR § 46.116, 122 and the Belmont Report which defines "legally effective informed consent." Defendants are not authorized to obtain Plaintiffs' consent and such fact demonstrates its mandate is *ultra vires*.

[105] Plaintiffs have the Constitutional right "to present [their] case and have its merits fairly judged." *Logan v. Zimmerman Brush Co*., 455 U.S. 422 (1982)

COMPLAINT                                        77

365.    Defendants' enactment and enforcement of its Policy under color of law, as applied, was *ultra vires* because it stripped Plaintiffs of legal rights outside of their Fourteenth Amendment due process rights.

366.    Defendants then used the State's at-will employment laws to interfere in the requirements applicable to PREP Act countermeasures and drugs, biologics, and devices authorized under 21 U.S.C. §360bbb-3 in violation of the Supremacy Clause and the PREP Act's express preemption language.

## J.    WILLFUL AND WANTON DISREGARD FOR RIGHTS

367.    Kaiser PolicyMakers are legally sophisticated in laws applicable to the investigational new drug classification and know they are legally restricted from applying outside pressure on Plaintiffs to participate in federally funded research projects, much less sanctioning them for refusing to participate.

368.    Kaiser PolicyMakers signed and/or approved the CDC COVID-19 Vaccination Provider Agreement and knew of its legal requirements prohibiting them from mandating participation in the Program's activities.[106] Moreover, they agreed to conduct joint medical research activities with the State and obtain Plaintiffs' legally effective informed consent.

369.    Kaiser PolicyMakers assured HHS that it would **never** place an individual under "coercion," "undue influence," "sanction," or "unjustifiable pressure" to inject unlicensed drugs into their bodies, which were funded by the federal government when HHS awarded Kaiser its Federal Wide Assurance Agreement Number. Kaiser PolicyMakers had to pledge to HHS that they

---

[106] 12(a) of the contract states, "Organization must comply with all applicable requirements as set forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine." 21 U.S.C. §360bbb-3 contains the option to accept or refuse, which Joint Board Members voluntarily agreed to adhere to when involving Plaintiffs in the CDC COVID-19 Vaccination Program.

would comply with 45 CFR § Part 46 and the Belmont Report having intended benefits for Plaintiffs.

370.   Kaiser PolicyMakers have an institutional review board (IRB) under 45 CFR Part 46 and the Belmont Report protocols overseeing all investigational new drug administration protocols, which prohibited the establishment of their Policy as they applied it.

371.   Kaiser PolicyMakers knew of each COVID-19's EUA Scope of Authorization prohibiting mandatory participation. Even if the CDC did not implement the COVID-19 Vaccination Program, Kaiser PolicyMakers knew that compliance with the EUA statute is a legal requirement they could not violate.

372.   Kaiser PolicyMakers oversee a multi-million dollar research program utilizing the same laws governing the COVID-19 EUA drugs.[107]

373.   Kaiser PolicyMakers oversaw the administration of drugs and biologics administered to patients under 21 U.S.C. §360bbb *et seq.,* for decades[108] and always obtained a

---

[107] Kaiser informs the public: "The Division is one of the nation's largest research facilities outside of a government or university setting. We are the primary professional home of more than 60 research scientists and 600 staff members who lead studies in epidemiology, health services, and clinical trials. Our studies cover a wide range of clinical topics, including cardiovascular disease, cancer, diabetes, substance abuse, mental health, maternal and child health, and women's health. Our research addresses broad issues, including the role of genes and the environment in health, the influence of behavior on disease prevention and chronic illness management, drug safety, health care policy, health services delivery, and disparities. We have almost 400 ongoing projects and contribute more than 500 scientific papers to peer-reviewed journals each year." "The Division's work is funded primarily by federal agencies, such as the National Institutes of Health, Centers for Disease Control and Prevention, and the Agency for Healthcare Research and Quality. The Permanente Medical Group and Kaiser Foundation Health Plan's Community Benefit Program are our major internal sponsors." - 1.About DOR. Kaiser Permanente Division of Research. Published June 21, 2023. Accessed October 23, 2023.
https://divisionofresearch.kaiserpermanente.org/about/Kaiser
[108] Hospitals routinely utilize INDs for cancer patients which require 21 U.S.C. §360bbb *et seq.,* authority.

patient's informed consent because they knew the statute's requirements and their duties under 45 CFR Part 46, the Belmont Report, 21 U.S.C. §360bbb-3, and the PREP Act.

374.    At no time during Kaiser's history has a federal law allowed Defendants to mandate compulsory use of an unlicensed IND as a condition of employment or the right to enjoy a benefit to which an individual involved in the IND is otherwise entitled.  However, Defendants have been under compulsory requirements of the federal government[109] and its various agencies for decades to ensure individuals under their authority are never under compulsion to participate in an investigational new drug, irrespective of its assigned expanded access protocols.

375.    Therefore, although the State issued an unlawful COVID-19 vaccination requirement, Kaiser PolicyMakers knew or should have known the policy would cause them to violate Plaintiffs' rights and to commit fraud under their IRB, FWA, CDC COVID-19 Vaccination Program Provider Agreement, and 21 U.S.C. §360bbb-3 duties.

376.    Kaiser PolicyMakers had a moral obligation and lawful authority to inform Governor Brown and Oregon Health Authority director Patrick Allen that their policy, as applied, was illegal and violated the terms Oregon agreed to when volunteering to distribute the federal government's COVID-19 property.  Kaiser PolicyMakers could have issued a public notice, engaged the courts for review and relief, and sought the lawful authority of the HHS Secretary.  However, Kaiser PolicyMakers had no intention of standing in the way of the COVID-19 cash cow and chose to pursue personal greed instead of fulling their legal duties.

---

[109] 21 U.S.C. §360bbb-3, the PREP Act, 45 CFR Part 46, Article VII of the ICCPR Treaty, FWA agreement, its Institutional Review Boards that ensures its compliance with the Belmont Report and the Common Rule.

377.    At all times pertinent, Defendants concealed Plaintiffs' rights to refuse administration of an EUA, EUI, or PREP Act product, which are under laws having significant legal consequences to Plaintiffs' legal rights.

378.    Individuals who consent to participate in the administration of a 21 U.S.C. §360bbb-3 product or PREP Act countermeasure must agree to the following terms and conditions, including but not limited to:

    A.    forfeiture of civil litigation rights resulting from injuries;[110]

    B.    allowing their private identifiable information to be collected and used for a variety of purposes by unknown persons;[111]

    C.    allow their involvement with the EUA product to be cataloged by various persons for unknown purposes,

    D.    allow the data collected about their adverse events to be utilized by researchers for unknown purposes and for eternity,[112]

    E.    assume greater risks to their safety, health, and legal rights.[113]

379.    Defendants enacted a "vaccination" Policy but exclusively relied on non-vaccines for compliance.

380.    Defendants did not inform Plaintiffs that the federally owned EUA drugs they relied upon were not licensed by the FDA nor classified as a "vaccine."

---

[110] PREP Act forfeits all civil actions for damages in most situations.
[111] Each EUA and/or the CDC COVID-19 Vaccination Program Provider Program requires manufacturers and/or emergency stakeholders to obtain private identifiable information.
[112] Each EUA and/or the CDC COVID-19 Vaccination Program Provider Program requires manufacturers and/or emergency stakeholders to monitor, report and study a variety of adverse reactions to EUA products.
[113] 21 U.S.C. §360bbb-3 requires potential recipients to be made aware of the risks, alternatives, and the fact that the product is only authorized by the Secretary under emergency conditions. These elements provide potential recipients with the required information to make a quality and legally effective decision to consent. Therefore, consent means the individual agrees to assume more than minimal risk as defined in 21 CFR 50.3(k).

381.    The Policy required Plaintiffs to seek a religious or medical exemption to have the right to opt out of having an investigational new drug injected into their bodies as a condition to continue employment. The requirement violated federal law because Plaintiffs' authority to reject the administration of an EUA, EUI, or PREP Act product is absolute.  Defendants had no authority to establish an exemption Policy nor act upon that Policy when Plaintiffs refused to seek such unlawful exemption.

382.    Defendants required Plaintiffs to inject drugs not researched for more than one trillion potential contraindications with 19,000 FDA-licensed drugs, their combinations, and their effects on thousands of other diseases.  The utter disregard for Plaintiffs' safety, health, and rights shocks the conscience and is unheard of in modern societies.

383.    Defendants destroyed the emotional well-being of Plaintiffs, and their dreams, goals, housing, retirement accounts, healthcare, and the lives of the loved ones relying upon Plaintiffs having employment, solely because Plaintiffs chose a federally secured right Defendants disagreed with, and it infuriated them.

384.    Therefore, Defendants enacted a Policy to accomplish that which the Constitution and the U.S. Congress prohibited.

385.    Defendants engaged in lawless activity that shocked the conscience as outrageous, intolerable, and extreme and placed Plaintiffs in severe emotional distress, fearing for their lives[114] and livelihoods. Such debased leadership is unheard of in modern societies and exceeds the bounds of decency.

---

[114] VAERS reported 1,562,008 entries from December 2020 through May 26, 2023, including 35,272 deaths (1.6 per hour) and 263,462 (12.11 per hour) serious injuries for the new and unvetted mRNA drugs. These numbers demonstrate historical entries for any drug reported to VAERS since it was first established.

## VII.  LEGAL CLAIMS

386.    The facts described above constitute a deprivation of several rights guaranteed to Plaintiffs by the United States Constitution, federal statutes, and treaties. These deprivations are actionable under 42 U.S.C. § 1983 because the Defendants acted under color of state law when issuing their COVID-19 vaccination requirements and administrating the CDC COVID-19 Vaccination Program pursuant to the CDC COVID-19 Vaccination Program Provider Agreement and the federal statutes cited therein.

387.    Court precedent demonstrates that federal statutes and regulations with rights conferring language are enforceable under 42 U.S.C. §1983.[115]

388.    Defendants were, and are, restricted from attempting to use state law to amend the above-referenced statutes, regulations, treaties, agreements, and contracts due to the Supremacy Clause Doctrine. The Supremacy Clause Doctrine, and the express preemption language in the PREP Act and 21 U.S.C. §360bbb-3, restrict public and private employers from using state laws to require individuals to participate in any EUA or PREP Act activity or use any EUA or PREP Act product. The preemption extends to any at-will employment law, doctrine, or custom an employer would otherwise claim as the right to interfere in the CDC Vaccination Program, 21 U.S.C. §360bbb-3, or PREP Act protocols and to amend conditions established by Congress for Plaintiffs' benefit.

---

[115] *Maine v. Thiboutot*, 448 U.S. 1 (1980), the court held that "Even were the language ambiguous, however, any doubt as to its meaning has been resolved by our several cases suggesting, explicitly or implicitly, that the §1983 remedy broadly encompasses violations of federal statutory as well as constitutional law." See also, *Health and Hospital Corporation of Marion Cty. V. Talevski.*

## COUNT ONE

### 42 U.S.C. § 1983 – Subjected to Investigational Drug Use

389.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 388, as if fully set forth herein.

390.    The CDC COVID-19 Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 CFR Part 46, the Belmont Report, 21 U.S.C. §360bbb-3, Article VII of the ICCPR Treaty, Federal Wide Assurance, 10 U.S.C. § 980, EUA Scope of Authorization letters, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

391.    21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) (the EUA statute) contains a required condition of the Secretary "to ensure that individuals to whom the product is administered are informed — 'of the option to accept or refuse administration of the product.'"

392.    21 U.S.C. §360bbb-3, the CDC COVID-19 Vaccination Program Provider Agreement, and each EUA's Scope of Authorization contains research conditions for COVID-19 medical products meeting 45 CFR 46.102(l)'s definition of research requiring adherence to 45 CFR § 46.101[116] *et seq.*

393.    "Before involving a human subject in research covered by this policy, an investigator shall obtain the legally effective informed consent of the subject or the subject's legally authorized representative." 45 CFR 46.116(a)(1)

394.    45 CFR § 46.116 and the Belmont Report contain the only known definition of legally effective informed consent.

---

[116]" This policy applies to all research involving human subjects conducted, supported, or otherwise subject to regulation by any Federal department or agency" 45 CFR 46.101(a).

395.    45 CFR 46.116(b)(8) states: "A statement that participation is voluntary, refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled."

396.    The Belmont Report, having the force of law,[117] declares, "An agreement to participate in research constitutes a valid consent only if voluntarily given. This element of informed consent requires conditions free of coercion and undue influence" and "Respect for persons requires that subjects, to the degree that they are capable, be given the opportunity to choose what shall or shall not happen to them. This opportunity is provided when adequate standards for informed consent are satisfied."

397.    Defendants breached their duties to establish "adequate standards" of informed consent when applying "sanctions," "coercion," "undue influence," and "unjustifiable pressures" on Plaintiffs to participate in COVID-19 investigational new drugs and devices (e.g., masks, testing articles). At all times pertinent, Defendants did not obtain Plaintiffs' legally effective informed consent.

398.    Article VII of the ratified International Covenant on Civil and Political Rights (ICCPR) Treaty affirms that "…no one shall be subjected without his free consent to medical or scientific experimentation."

399.    Defendants subjected Plaintiffs to investigational drug use when issuing a COVID-19 vaccination requirement relying exclusively on INDs for compliance under threat of penalty. The punishment applied to Plaintiffs by Defendants when exercising their statutory right to refuse

---

[117] 45 CFR § 46.101(c), 45 CFR 46.101(i), 45 CFR § 46.122

aptly demonstrates they were subjected to EUA investigational drug use outside of their free consent.

400.    The Defendants' actions described above, individually and/or collectively, acting under color of state law, and in deprivation of the Constitutional rights and rights secured by the above federal statutes, regulations, and treaty, unlawfully subjected Plaintiffs to the use of investigational medical products under threat of penalty outside of their legally effective informed consent as described in the above facts, thereby causing them damages described in Paragraphs 511 through 517, *infra*.

## COUNT TWO

## 42 U.S.C. § 1983 – Deprivation of Equal Protection Rights

401.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 388, as if fully set forth herein.

402.    The CDC COVID-19 Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 CFR Part 46, the Belmont Report, 21 U.S.C. §360bbb-3, Article VII of the ICCPR Treaty, Federal Wide Assurance, the EUA Scope of Authorization letter, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

403.    The Fourteenth Amendment to the U.S. Constitution guarantees equal protection of the laws.

404.    At all times pertinent, Defendants intentionally only punished individuals who exercised their federally secured right to refuse administration of a product under the PREP Act or an EUA drug (e.g., Pfizer-BioNTech COVID-19 Vaccine), biologic, or device (e.g., masks,

COVID-19 testing articles) thereby applying the laws unequally to and depriving Plaintiffs, of their Constitutional Equal Protection Rights.

405.    The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, have deprived the Plaintiffs of their equal protection rights as described in the above facts, thereby causing them damages described in Paragraphs 511 through 517, *infra*.

## COUNT THREE

### 42 U.S.C. § 1983 – Deprivation of Constitutional Procedural Due Process Rights

406.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 388, as if fully set forth herein.

407.    At all times pertinent, Defendants, having knowledge of Plaintiffs' Constitutional and federally secured right to refuse administration of EUA drugs and medical products, intentionally ignored those rights in an attempt to increase the number of participants in the CDC COVID-19 Vaccination Program, resulting in the deprivation of Plaintiffs' substantive and procedural Due Process rights.

408.    "The fundamental requisite of due process of law is the opportunity to be heard." *Louisville & Nashville R. Co. v. Schmidt*, 177 U. S. 230, 177 U. S. 236.

409.    Plaintiffs have the Constitutional right "to present [their] case and have its merits fairly judged." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982). At all times pertinent, Defendants refused to acknowledge Plaintiffs' Constitutional and Statutory rights, thereby nullifying impartiality.

410.    Defendants did not provide Plaintiffs with a date, time, place, or procedure to defend their right to refuse injection of an unlicensed drug before an impartial body considering their lawful authority to refuse before depriving them of their liberty and property.

411.    "the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the "liberty" and "property" concepts of the Fifth Amendment, *Dent v. West Virginia,* 129 U. S. 114; *Schware v. Board of Bar Examiners,* 353 U. S. 232; *Peters v. Hobby,* 349 U. S. 331, 349 U. S. 352 (concurring opinion); *cf. Slochower v. Board of Education,* 350 U. S. 551; *Truax v. Raich,* 239 U. S. 33, 239 U. S. 41; *Allgeyer v. Louisiana,* 165 U. S. 578, 165 U. S. 589-590; *Powell v. Pennsylvania,* 127 U. S. 678, 127 U. S. 684"- Greene v. McElroy, 360 U.S. 474 (1959)

412.    Defendants, acting under color of law, interfered with Plaintiffs' liberty and property demanding a procedural review before depriving Plaintiffs of their interest in liberty and property (i.e., use of a state-issued license and private employment).

413.    The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, have deprived the Plaintiffs of their procedural due process rights as described in the above facts, thereby causing them damages described in Paragraphs 511 through 517, *infra*.

## **COUNT FOUR**

## **42 U.S.C. § 1983 – Deprivation of Constitutional Substantive Due Process Rights**

414.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 388, as if fully set forth herein.

415.    The CDC COVID-19 Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 CFR 46, the Belmont Report, 21 U.S.C.

§360bbb-3, Article VII of the ICCPR Treaty, Federal Wide Assurance, the EUA Scope of Authorization letter, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

416.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution guarantees the right to due process of law before infringing a citizen's interest in life, liberty, or property.

417.    Defendants' requirement that Plaintiffs inject unlicensed drugs into their bodies as a condition to sell their labor "is not a legitimate exercise of the police power of the State, but an unreasonable, unnecessary and arbitrary interference with the right and liberty of the individual to contract in relation to labor, and, as such, it is in conflict with, and void under, the Federal Constitution." *Lochner v. New York*, 198 U.S. 45 (1905)[118]

418.    Defendants' Policy, as applied, deprived Plaintiffs of their right under 21 U.S.C. §360bbb-3 to refuse the administration of the authorized products, a violation of Plaintiffs' substantive due process rights.

419.    Defendants' Policy, as applied, deprived Plaintiffs of their lawful right to freely determine their participation in the administration of a PREP Act countermeasure, a violation of Plaintiffs' substantive due process rights.

420.    Defendants' Policy, as applied, required Plaintiffs to seek an exemption as the means to enjoy their 21 U.S.C. §360bbb-3 option, and their choice of free participation in a PREP Act countermeasure, a violation of Plaintiffs' substantive due process rights.

---

[118] Although the U.S. Supreme Court no longer follows the *Lochner* doctrine, the statement is applicable when viewed through the fact that the Defendants, acting on a state custom, were stripped of their police power under 21 U.S.C. §360bbb-3 and the PREP Act to deny Plaintiffs the right to sell their labors in the marketplace.

421.    Defendants' Policy, as applied, required Plaintiffs to surrender their substantive due process rights to seek judicial relief should they incur injury from the product's use or its administration as a condition to continue employment, a violation of Plaintiffs' substantive due process rights.

422.    The U.S. Court held that "A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process Clause of the Fourteenth Amendment" Schware v. Board of Bar Examiners, 353 U.S. 232 (1957)

423.    Defendants, acting under color of law, excluded Plaintiffs from the practice of their licensed profession in a manner that contravened Due Process.

424.    The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, have deprived the Plaintiffs of their substantive due process rights as described in the above facts, thereby causing them damages described in Paragraphs 511 through 517, *infra*.

## COUNT FIVE

## 42 U.S.C. § 1983 - Deprivation of Rights Under the Spending Clause

425.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 388, as if fully set forth herein.

426.    The laws cited in the CDC COVID-19 Vaccination Program Provider Agreement, 45 CFR §46.122, 10 U.S.C. §980, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

427.    In *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002), "the Court has found that spending legislation gave rise to rights enforceable under §1983 only in *Wright* v. *Roanoke Redevelopment and Housing Authority,* 479 U. S. 418, 426, 432, and *Wilder* v. *Virginia Hospital Assn.,* 496 U. S.

498, 522523, where statutory provisions explicitly conferred specific monetary entitlements upon the plaintiffs, and there was no sufficient administrative means of enforcing the requirements against defendants that failed to comply." See also, *Health and Hospital Corporation of Marion County v. Talevski*, *supra*, 599 U.S. _____ (2023)

428.    The federal government appropriated funds to the Department of Defense to enter into contracts with the manufacturers of the EUA investigational drugs to purchase 100% of the products and to distribute them to the Organizations that signed the CDC COVID-19 Vaccination Program Provider Agreement.

429.    The federal government funds any charges associated with the administration of the COVID-19 EUA shots via Medicare.[119]

430.    In the case at bar, the "specific monetary entitlement" to Plaintiffs, and any potential recipient, is that the EUA investigational drugs and their administrative costs are free of charge to the recipients.

431.    45 CFR §46.122 provides: "Federal funds administered by a Federal department or agency may not be expended for research involving human subjects unless the requirements of this policy have been satisfied."

432.    10 U.S.C. §980 states: "Funds appropriated to the Department of Defense may not be used for research involving a human being as an experimental subject unless – the subject's informed consent is obtained in advance…"

433.    Only Organizations who agreed to participate in the CDC Vaccination Program can bill the government for administering the shots.

---

[119] https://www.medicare.gov/medicare-coronavirus

434.    The EUA statute and the PREP Act lack any enforcement scheme for a breach of a potential recipient's right to refuse administration of an EUA investigational drug without penalty that would preclude §1983 enforcement.

435.    Agreement Requirement Number 3 on the CDC Provider Agreement states, "Organization must not sell or seek reimbursement for COVID-19 Vaccine and any adjuvant, syringes, needles, or other constituent products and ancillary supplies that the federal government provides without cost to Organization."

436.    Agreement Requirement Number 4 states, "Organization must administer COVID-19 Vaccine regardless of the vaccine recipient's ability to pay COVID-19 Vaccine administration fees."

437.    These two provisions establish a specific monetary entitlement to the individual.

438.    Agreement Requirement Number 5 states, "Before administering COVID-19 Vaccine, Organization must provide an approved Emergency Use Authorization (EUA) Fact Sheet or vaccine information statement (VIS), as required, to each vaccine recipient, the adult caregiver accompanying the recipient, or other legal representative."

439.    Agreement Requirement Number 5 complies with funding restrictions established by Congress in, 45 CFR § 46.122 and 10 U.S.C. § 980.

440.    The compliance is found in the EUA Fact Sheet, notating the individual's right to refuse the administration of the product. This express right is the fundamental requirement in obtaining the legally effective informed consent of the individual.

441.    Whether for civilians under 45 CFR § 46.122 or personnel under 10 U.S.C. § 980, Congress created a specific monetary entitlement for individuals considering whether or not to participate in a federally funded research activity. That entitlement means they have the explicit

COMPLAINT                                    92

right to be informed of the risks, benefits, and alternatives to the research product and then consider whether to participate without incurring a fee or being under outside pressure to participate.

442.    This monetary entitlement is most apparent in the CDC COVID-19 Vaccination Program Provider Agreement. An individual can seek out a participating COVID-19 Program healthcare professional, obtain medical counseling, ask questions, and read literature. If they choose not to participate, they will not incur a fee from the professional for the administrative time spent considering whether or not to participate since the healthcare professional must inform them of their legal right to refuse under 21 U.S.C. §360bbb-3.

443.    The healthcare professional agreed to comply with the legally effective consent requirements via Agreement Number 12 on the CDC COVID-19 Vaccination Program Provider Agreement mandating that (1) "Organization must comply with all applicable requirements as set forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine," and (2) "Organization must administer COVID-19 Vaccine in compliance with all applicable state and territorial vaccination laws."

444.    The "all applicable requirements as set forth by the U.S. Food and Drug Administration, including…any EUA" extends to 21 USC 360bbb-3 (Section 564), 45 CFR 46, the FWA, the IRB, the ICCPR Treaty, and the Scope of Authorization letter.

445.    Defendants were under explicit legal obligations to comply with 45 CFR § 46.122, 10 U.S.C. § 980 via their FWA agreement and their CDC COVID-19 Vaccination Program participation.

446.    Therefore, the laws cited in CDC COVID-19 Vaccination Program Provider Agreement, 21 U.S.C. §360bbb-3, 45 CFR § 46.122, and 10 U.S.C. §980 clearly and

unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983 when federal funds are expended under those provisions of law.

447.    The Defendants' actions described above, individually and/or collectively, and in deprivation of the rights and privileges secured by the Constitution and the above statutes and regulations, refused to obtain the legally effective informed consent of the Plaintiffs in violation of spending legislation as described in the above facts, thereby causing them damages described in Paragraphs 511 through 517, *infra*.

## COUNT SIX

### 42 U.S.C. § 1983 - Excessive Fine Clause

448.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 388, as if fully set forth herein.

449.    The CDC COVID-19 Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 CFR §46, the Belmont Report, 21 U.S.C. §360bbb-3, Article VII of the ICCPR Treaty, Federal Wide Assurance, the EUA Scope of Authorization letter, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

450.    In *Hudson v. United States*, 522 U.S. 93, 118 S.Ct 488, 139 L.Ed.2d 450 (1997), the court held:

> The Due Process and Equal Protection Clauses already protect individuals from sanctions which are downright irrational. *Williamson v. Lee Optical of Okla., Inc.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). The Eighth Amendment protects against excessive civil fines, including forfeitures. *Alexander v. United States,* 509 U.S. 544, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993); *Austin v. United States,* 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993)."

451.    The U.S. Supreme Court held "The Excessive Fines Clause is therefore incorporated by the Due Process Clause of the Fourteenth Amendment" because 'fines may be employed 'in a measure out of accord with the penal goals of retribution and deterrence,' Harmelin v. Michigan, 501 U. S. 957, 979, n. 9 (1991) (opinion of Scalia, J.), therefore, 'Protection against excessive punitive economic sanctions secured by the Clause is, to repeat, both 'fundamental to our scheme of ordered liberty' and ;deeply rooted in this Nation's history and tradition.' McDonald, 561 U. S., at 767 (internal quotation marks omitted; emphasis deleted)." - *Timbs v. Indiana*, 139 S.Ct. 682, 203 L.Ed.2d 11 (2019)

452.    "It is commonly understood that civil proceedings may advance punitive as well as remedial goals, and, conversely, that both punitive and remedial goals may be served by criminal penalties." *United States* v. *Halper, 490* U. S. 435, 447-448 (1989).

453.    Defendants' used a State Policy to further their personal goals and applied punishment that did not just preclude Plaintiffs from holding a job but, more severely, excluded Plaintiffs from completely practicing their licensed profession.  A sanction so severe that it can only be viewed as corporal punishment of one's career, requiring it to come under the purview of the Eighth Amendment.

454.    "The Eighth Amendment's text is not expressly limited to criminal cases, and its history does not require such a limitation. Rather, the crucial question is whether the forfeiture is monetary punishment, with which the Excessive Fines Clause is particularly concerned. Because sanctions frequently serve more than one purpose, the fact that a forfeiture serves remedial goals will not exclude it from the Clause's purview, so long as it can only be explained as serving in part to punish." Austin v. United States, 509 U.S. 602 (1993)

455.     Defendants terminating Plaintiffs' employment can only be viewed as forfeiture of Plaintiff's property (professional license) and career.

456.     "A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process Clause of the Fourteenth Amendment." *Schware v. Board of Bar Examiners*, 353 U.S. 232 (1957)

457.     Moreover, the U.S. Court held, "the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the "liberty" and "property" concepts of the Fifth Amendment, *Dent v. West Virginia,* 129 U. S. 114; *Schware v. Board of Bar Examiners,* 353 U. S. 232; *Peters v. Hobby,* 349 U. S. 331, 349 U. S. 352 (concurring opinion); *cf. Slochower v. Board of Education,* 350 U. S. 551; *Truax v. Raich,* 239 U. S. 33, 239 U. S. 41; *Allgeyer v. Louisiana,* 165 U. S. 578, 165 U.S. 589-590; *Powell v. Pennsylvania,* 127 U. S. 678, 127 U. S. 684"- Greene v. McElroy, 360 U.S. 474 (1959).

458.     Therefore, when Kaiser and the State conspired in the joint action of terminating Plaintiffs' complete employment in their chosen profession, interfering in the property rights granted to Plaintiffs through a state-issued license, Kaiser PolicyMakers and the State violated Plaintiffs' Eighth Amendment rights because the sanction acted as punishment instead of a State's police power meant to encourage behavior.  The fines were excessive by any standard courts have used when reviewing the actions of a government against a charged felon, much less an individual charged with a civil infraction.

459.     The State could not legislate for Plaintiffs to inject unlicensed drugs into their bodies as a condition to continue employment in their chosen profession.  Therefore, Governor Brown, and Patrick Allen developed an *ultra vires* policy that Kaiser PolicyMakers used for personal greed to accomplish that which the U.S. Constitution and Congress prohibit.  To ensure

expedient compliance with their unlawful actions, Defendants applied terminal punishment in violation of the Excessive Fines Clause.

460.    The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, manipulated the Constitutional rights of Plaintiffs out of existence as described in the above facts, thereby causing them damages described in Paragraphs 511 through 517, *infra*.

## COUNT SEVEN

### 42 U.S.C. § 1983 - Unconstitutional Conditions Doctrine

461.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 388, as if fully set forth herein.

462.    The CDC COVID-19 Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 CFR §46, the Belmont Report, 21 U.S.C. §360bbb-3, Article VII of the ICCPR Treaty, Federal Wide Assurance, the EUA Scope of Authorization letter, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

463.    "[T]he state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose. But the power of the state in that respect is not unlimited; and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence (emphasis added)". *Frost Trucking Co. v. R.R. Com*, 271 U.S. 583, 593-94 (1926)

464.    Governor Brown and Kaiser PolicyMakers established conditions requiring Plaintiffs to surrender their Constitutional rights under the Fourteenth Amendment (e.g. equal protection and due process) to enjoy privileges of the State, such as the ability to sell their labor in the marketplace freely and to use their property (state-issued medical license) without interference.

465.    The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, manipulated the Constitutional rights of Plaintiffs out of existence as described in the above facts, thereby causing them damages described in Paragraphs 511 through 517, *infra*.

## COUNT EIGHT

## 42 U.S.C. § 1983 - PREP Act

466.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 388, as if fully set forth herein.

467.    The PREP Act, the CDC COVID-19 Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 CFR Part 46, the Belmont Report, 21 U.S.C. §360bbb-3, Article VII of the ICCPR Treaty, Federal Wide Assurance, the EUA Scope of Authorization letter, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

468.    The PREP Act provides certain immunities to "covered countermeasures" when the HHS Secretary determines there is a public health emergency and makes a declaration of that emergency through the publication in the Federal Register specifying the conditions by which the covered countermeasure and covered persons can participate and the use of such covered countermeasure.[120]

---

[120] 42 USC 247d-6d(b)(1)

469.   Congress preempted the State of Oregon and medical facilities it licenses from establishing laws and continuing in effect with existing ones (at-will employment doctrine) that would otherwise interfere with Plaintiffs' authority with respect to "conduct undertaken" concerning "any matter included in a requirement applicable" to a "covered countermeasure" under the PREP Act or 21 U.S.C. §360bbb-3 including the required condition that Plaintiffs be informed of their legal right to either accept or refuse said countermeasure.[121],[122]

470.   Congress was explicit that the HHS Secretary must establish conditions ensuring that "potential participants are educated with respect to…the voluntary nature of the program…"[123]

471.   The "program" consists of those agreeing to manufacture, distribute, administer ("covered person"), and receive[124] ("covered individual") the product.

472.   Congress expressly restricted the HHS Secretary from having any authority to require any person to participate in any activity involving a "drug," "biologic," or "device" under 21 U.S.C. §360bbb-3[125] or any "covered countermeasure" under the PREP Act. By extension, any person authorized to participate in the program is also restricted from mandating participation.

473.   The State of Oregon and Kaiser PolicyMakers established laws and policies that conflicted with the PREP Act and the EUA statute when they required Plaintiffs to participate in the use of a covered countermeasure under threat of penalty.

---

[121] 21 U.S.C. 301 is the Federal Food, Drug and Cosmetic Act, which ranges from §301 to §399, and thus includes 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III).
[122] 42 USC 247d-6d(b)(8)
[123] 42 USC 247d-6e(c)
[124] 42 U.S.C. §247d-6e(e)(2)
[125] 21 U.S.C. §360bbb-3(l): "Nothing in this section provides the Secretary any authority to require any person to carry out any activity that becomes lawful pursuant to an authorization under this section…"

474.    Moreover, Defendants engaged in policy-making and conduct that conflicted with the PREP Act and the Fifth and Fourteenth Amendments of the United States Constitution.

475.    Mandatory participation in PREP Act covered countermeasures is a severe violation of the Constitution's Due Process guarantees.

476.    No person can be required to enter into a legally binding agreement requiring the forfeiture of legal rights under threat of penalty.

477.    The terms and conditions associated with the PREP Act and 21 U.S.C. §360bbb-3 represent a legally binding agreement as established by the U.S. Congress.

478.    Those terms require Plaintiffs to forfeit their right to seek judicial relief from injuries sustained from the use of the countermeasure and injuries sustained from the countermeasure's administration.

479.    The agreement also requires Plaintiffs to divulge their private health information and private identity and assume greater risks to their health, safety, and legal rights.

480.    Defendants' pronouncement that Plaintiffs must use covered countermeasures prospectively denies Plaintiffs their due process rights should they incur injury because the PREP Act denies them access to judicial relief for those injuries.

481.    Governor Brown's and Kaiser PolicyMakers' policies violated Plaintiffs' rights to accept or refuse PREP Act covered countermeasures without pressure or influence being placed upon them.

482.    Governor Brown's and Kaiser PolicyMakers' policies requiring the use of investigational drugs, testing articles, masks, and other devices under threat of penalty, violating Plaintiffs' right to voluntary participation and due process rights.

483.    Defendants changing the voluntary nature of the program into an involuntary program endangers the immunities of existing covered countermeasures established by the HHS Secretary.

484.    Defendants' interference is a direct assault on the Constitutional rights of Plaintiffs, which opens the doors to legal remedies not envisioned by Congress but required of the Constitution for resulting injuries sustained by individuals when under threat of penalty to participate.

485.    The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, deprived the Constitutional and federal legal rights of Plaintiffs as described in the above facts, thereby causing them damages described in Paragraphs 511 through 517, *infra*.

## COUNT NINE

### Breach of Contract, Third Party Beneficiary

486.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 388, as if fully set forth herein.

487.    The CDC COVID Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 CFR 46, 21 U.S.C. §360bbb-3, Title 21 of the US Code, the EUA Scope of Authorization letter clearly and unambiguously create third-party beneficiary rights.

488.    The primary third-party beneficiary right intended for Plaintiffs is the freedom to consider participation in a federally funded EUA (drug, biologic, or device), PREP Act, or other emergency medical countermeasure products or activities that are free from "sanctions," "coercion," "undue influence," "unjustifiable pressures to participate. The other third-party benefit

COMPLAINT                                    101

intended for Plaintiffs is that they must not fear the loss of benefits to which they are otherwise entitled when considering participation.

489.    Defendants issued a policy that was an "overt threat of harm"[126] to the financial and emotional well-being of Plaintiffs for the express purpose of coercing them to participate in the CDC COVID-19 Vaccination Program outside of their free will and voluntary consent.

490.    The Defendants' actions described above, individually and/or collectively, and in breach of the CDC COVID-19 Vaccination Program Provider Agreement, deprived the Plaintiffs of the benefits intended to be conferred upon them through the terms and conditions of the CDC COVID Vaccination Program Provider Agreement as described in the above facts, thereby causing them damages described in Paragraphs 511 through 517, *infra*.

## COUNT TEN

## Wrongful Termination

491.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 388, as if fully set forth herein.

492.    The Supremacy Clause, PREP Act, and 21 U.S.C. §360bbb-3 preempt State laws conflicting with the United States Government's emergency medical countermeasure objectives, including Oregon State's at-will employment laws.

493.    Defendants lacked authority to condition employment upon Plaintiffs participating in a 21 U.S.C. §360bbb-3 medical countermeasure or any product or activity under PREP Act authority.

---

[126] "Coercion occurs when an overt threat of harm is intentionally presented by one person to another in order to obtain compliance." — The Belmont Report

COMPLAINT                                                    102

494.    Defendants intentionally and unlawfully misrepresented their authority to Plaintiffs to cause them to surrender their constitutional and statutory rights.

495.    21 U.S.C. §360bbb-3 and the PREP Act clearly preempts Oregon's at-will employment doctrine when an employer uses that doctrine to interfere in Plaintiff's federally secured right to choose one of the two options.

496.    Defendants cannot rely on Oregon's at-will employment doctrine as a defense to Plaintiffs' claim of wrongful termination because the federal statutes preempted the at-will doctrine's lawful authority when used to interfere with the federal goals of providing Plaintiffs access to medical countermeasures and covered countermeasures.

497.    The plaintiffs did not knowingly submit to the deprivation of labor, wages, or employment.

498.    The Defendants' actions, individually and/or collectively, and in derogation of Oregon's common laws unlawfully terminated Plaintiffs' employment engaged in violation of the public policy exception and the federal statute's preemption of that at-will employment doctrine as described in the above facts, thereby causing them damages described in Paragraphs 511 through 517, *infra*.

### COUNT ELEVEN

### Intentional Infliction of Emotional Damage

499.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 388, as if fully set forth herein.

500.    When the United States Congress refused to allow, Defendants, to apply consequences to Plaintiffs refusing to participate in the use of COVID-19 investigational drugs, Defendants engaged in a scorched earth policy and inflicted with malicious intent severe emotional

distress to the fullest extent that one in their positions of authority and power could inflict to the detriment of Plaintiffs' emotional well-being.

501.    Plaintiffs built lives, careers, and dreams around their continued employment at Kaiser and placed their complete trust in the integrity of Defendants to honor their loyalty and commitment. Plaintiffs had an implied contract that if they served the needs of Defendants faithfully and in accordance with company policy and all applicable licensing standards, Defendants would always protect their employment and thus also their dreams, goals, aspirations, and livelihoods.

502.    However, Defendants did not honor their implied agreement with Plaintiffs. Rather, Defendants acted with moral turpitude, violated federal law, ignored their contractual agreements, and demanded Plaintiffs inject the unlicensed drugs wholly owned by the federal government into their bodies despite Plaintiffs' pleas for Defendants to honor their rights and Plaintiffs demands upon Defendants to prove their lawful authority to mandate such an activity.

503.    Defendants manage a licensed medical facility that signed explicit contracts with the federal government, promising never to place individuals under a sanction to participate in the administration of unlicensed investigational drugs. Defendants then got up from signing those agreements and willfully ignored their legal duties without fear of consequence for the explicit purpose of intentionally destroying the lives of Plaintiffs simply because Plaintiffs chose a federally secured right Defendants disagreed with.

504.    There can be no effective argument that such conduct is not outrageous, extreme, and shocks the conscience. What employee in the State of Oregon would not find such behavior outrageous by an employer?

505.    Plaintiffs endured sleepless nights, loss of economic opportunities, financial struggles, and other life-altering events because Defendants chose to push a personal agenda onto the lives of Plaintiffs despite Defendants promising the federal government, State of Oregon, and Plaintiffs that they

506.    To state a claim for intentional infliction of emotional distress ("IIED") in Oregon, a plaintiff must show that "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *Mullen v. Meredith Corp.*, 271 Or.App 698, 713 (2015). *Upchurch v. Multnomah Univ.*, 3:19-cv-00850-AC, 7 (D. Or. Dec. 7, 2021).

507.    The facts and the Defendants' conduct committed with gross negligence, reckless, or intent, as described above in the complaint, give rise to a claim of intentional infliction of emotional distress under the common law of the State of Oregon against the Defendants for the damages described in Paragraphs 511 through 517, *infra*.

**COUNT TWELVE**

**Implied Private Right of Action 21 U.S.C. §360bbb-3**

508.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 388, as if fully set forth herein.

509.    Should the court not agree that Kaiser PolicyMakers was engaged in State Action, Plaintiffs claim that 21 U.S.C. §360bbb-3 contains an implied private right of action pursuant to *Cannon v. University of Chicago*, 441 U.S. 677 (1979), *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498 (1990), and *Cort v. Ash*, 422 U.S. 66 (1975).

510.    The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty have deprived the Plaintiffs of their explicit right to refuse the administration of an emergency use authorized drug and/or medical product without penalty as described in the above facts, thereby causing them damages described in Paragraphs 511 through 517, *infra*.

## VIII.  DAMAGES RECOVERABLE AND DEMANDED

511.    The following paragraphs are hereby incorporated by reference into Counts One through Ten, as if set forth here *in extenso*.

512.    As a direct and proximate result of the Defendants' unreasonable and unlawful actions, Plaintiffs have suffered past damages and will suffer future damages, both compensatory and general, including, but not limited to, front and back pay; loss of benefits; loss of accumulated sick pay; loss of retirement accounts; lost earnings on retirement funds; vacation time, compensatory time, and paid time off; negative tax consequences (in the event of a lump sum award), including related accountant fees; attorney's fees; emotional distress; mental, psychological and physical harm; loss of income; loss of enjoyment of life; for which defendants are liable in compensatory, punitive, exemplary, legal, equitable, and all other damages that this Court deems necessary and proper.

513.    When the Defendants' behavior reaches a sufficient threshold, punitive damages are recoverable in § 1983 cases. *Smith v. Wade*, 461 U.S. 30 (1983).  Because Defendants' actions were intentional and willful, Plaintiffs are entitled to, and hereby demand, an award of punitive damages against each and every Defendant in an amount sufficient to deter them, individually and collectively, from repeating their unconstitutional actions.  *Smith v. Wade*, 461 U.S. 30 (1983)

COMPLAINT                                   106

514.     Because Defendants' actions involved reckless or callous indifference to the Plaintiffs' federally protected rights, Plaintiffs are entitled to, and hereby demand, an award of punitive damages against each and every Defendant in an amount sufficient to deter them, individually and collectively, from repeating their unconstitutional actions. *Smith v. Wade*, 461 U.S. 30 (1983)

515.     Because Defendants' actions were motivated by evil motive or intent, Plaintiffs are entitled to, and hereby demand, an award of punitive damages against each and every Defendant in an amount sufficient to deter them, individually and collectively, from repeating their unconstitutional actions. *Smith v. Wade*, 461 U.S. 30 (1983)

516.     Plaintiffs seek recovery of attorney's fees under the Civil Rights Attorney's Fees Awards Act of 1976 and 42 U.S.C. § 1988, and under any other provision of law or basis.

517.     Plaintiffs seek recovery of all court costs and out-of-pocket litigation expenses, including but not limited to expert fees, and legal interest on any amount of damages awarded.

## IX.  JURY TRIAL DEMAND

518.     Plaintiffs are entitled to, and hereby demand, a trial by jury on all issues of fact.

WHEREFORE, Plaintiffs pray that Defendants be served with a copy of this Complaint and be duly cited to appear and answer same, and after due proceedings are had, there be judgment herein against the Defendants awarding Plaintiffs all damages claimed herein, plus legal interest, taxable costs, expert fees, and attorney's fees, and all other relief determined to be just and equitable by this Court.

Respectfully submitted,

Dated: November 30, 2023

**JONCUS LAW P.C.**

BY:   s/ Stephen J. Joncus
**Stephen J. Joncus**, OSB No. 013072
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
Telephone: (971) 236-1200
Facsimile: (971) 244-7997
steve@joncus.net

**SCHEXNAYDRE LAW FIRM**

BY:   s/ *David J. Schexnaydre*
DAVID J. SCHEXNAYDRE, T.A., *Pro Hac Vice Pending*
Louisiana Bar Roll #: 21073
Mississippi Bar Roll #: 102557
Texas Bar Roll #24076142
2895 Highway 190 • Suite 212
Mandeville, Louisiana 70471
Telephone: (985) 292-2020
Fax: (985) 235-1089
david@schexnaydre.com

*Attorneys for Plaintiffs*